**Ann DOE et al., Plaintiffs,**

**v.**

**Helene WOHLGEMUTH, Individually and as Secretary of the Department of Public Welfare, Commonwealth of Pennsylvania, et al., Defendants.**

**Civ. A. No. 73–846.**

United States District Court,
W. D. Pennsylvania.

May 3, 1974.

R. Stanton Wettick, Jr., Pittsburgh, Pa., for plaintiffs.

Louis Kwall, Pittsburgh, Pa., for defendants.

Before WEIS, Circuit Judge, and SORG and SNYDER, District Judges.

## OPINION AND ORDER

SNYDER, District Judge.

The Plaintiffs, as welfare recipients and participants in the Pennsylvania Medical Assistance Program (PMAP), have filed their Complaint on behalf of themselves and all others similarly situated against the Pennsylvania Department of Public Welfare (Department) and certain of its Officers and/or Administrative Representatives. They challenge the State of Pennsylvania's refusal to provide reimbursement for the cost of abortions which they sought to have performed at Magee-Womens Hospital, Pittsburgh, Pennsylvania. The Department's Procedures hold that abortions may be performed under the PMAP only in the following situations: [1]

> "1. There is documented medical evidence that continuance of the pregnancy may threaten the health or life of the mother;
>
> 2. There is documented medical evidence that the infant may be born with incapacitating physical deformity or mental deficiency; or
>
> 3. There is documented medical evidence that a continuance of a pregnancy resulting from legally established statutory or forcible rape, or incest, may constitute a threat to the mental or physical health of a patient;
>
> 4. Two other physicians chosen because of their recognized professional competency have examined the patient and have concurred in writing; and
>
> 5. The procedure is performed in a hospital accredited by the Joint Commission on Accreditation of Hospitals."

Jurisdiction was claimed under 28 U.S.C. § 1343(3) [2] and (4) [3] as derived

---

1. While neither Counsel for the Plaintiffs nor for the Department referred this Court to a governing regulation, it was agreed that the above set forth criterion as excerpted from an Opinion Letter of the Attorney General dated August 6, 1973, correctly stated the requirements.

2. *Section 1343: "Civil rights and elective franchise*

The district courts shall have original jurisdiction of any civil action authorized by law to be commenced by any person:

* * * * *

(3) To redress the deprivation, under color of any State law, statute, ordinance, regulation, custom or usage, of any right, privilege or immunity secured by the Constitution of the United States or by any Act of Congress providing for equal rights of citizens or of all persons within the jurisdiction of the United States;"

3. "(4) To recover damages or to secure equitable or other relief under any Act of Congress providing for the protection of civil rights, including the right to vote."

from 42 U.S.C. § 1983.[4] The Plaintiffs claim that Title XIX of the Social Security Act requires reimbursement of physicians and hospital services for abortions which they elect; and they further claim the unrestricted right of such reimbursement under the Equal Protection Clause of the Fourteenth Amendment and the right to privacy as recognized in Roe v. Wade, 410 U.S. 113, 93 S.Ct. 705, 35 L.Ed.2d 147 (1973) rehearing denied 410 U.S. 959, 93 S.Ct. 1409, 35 L.Ed.2d 694.

After hearing, the District Court on October 9, 1973, granted a Preliminary Injunction directing the Defendants to pay the reasonable costs of medical services rendered for any abortion performed in Allegheny County, Pennsylvania (as requested by the Plaintiffs) by a licensed physician on a woman otherwise eligible for PMAP benefits without additionally meeting the criterion hereinabove set forth.

On the same date, the Court filed an Order requesting the convening of a Three Judge Court, as there appeared to be a substantial constitutional question as to whether the Department's Statewide Regulations and Procedures were consistent with the Social Security Act or operated to deny the Plaintiffs equal protection of the law. See: United States Dept. of Agriculture et al. v. Moreno, 413 U.S. 528, 93 S.Ct. 2821, 37 L.Ed.2d 782 (1973); Wilwording v. Swenson, 404 U.S. 249, 92 S.Ct. 407, 30 L.Ed.2d 418 (1971); King v. Smith, 392 U.S. 309, 88 S.Ct. 2128, 20 L.Ed.2d 1118 (1968); Charleston v. Wohlgemuth, 332 F.Supp. 1175 (E.D.Pa.1971) affirmed 405 U.S. 970, 92 S.Ct. 1204, 31 L.Ed.2d 246. Determination of the Class was referred to the Three Judge Court. On October 12, 1973, Chief Judge Collins J. Seitz of the Third Circuit duly ordered the empaneling of the Three Judge Court. On October 25, 1973, the Defendants filed an Answer which denied that the Plaintiffs had standing to sue, that the Court had subject matter jurisdiction over the cause of action, and that the Plaintiffs' Complaint stated a cause of action for which relief could be granted.

A distillation of the PMAP shows that Pennsylvania is a participating State in a cooperative plan for providing reimbursement for medical services to the indigent under the Social Security Act (42 U.S.C. § 1396 et seq.). The Act makes provision for medical services to the "categorically needy" (42 U.S.C. § 1396a(a)(13), 1396(a)(13), 45 CFR 249.-10(a)(1)), or to the "medically needy" (42 U.S.C. § 1396a(a)(10)(B), 45 CFR 249.10(a)(2)). Pennsylvania provides services to the "medically needy". 62 P. S. § 441.1 reads as follows:

"The following persons shall be eligible for medical assistance:

(1) Persons who receive or are eligible to receive cash assistance grants under this article;

(2) Persons who meet the eligibility requirements of this article for cash assistance grants except for citizenship durational residence and any eligibility condition or other requirement for cash assistance which is prohibited under Title XIX of the Federal Social Security Act; and

(3) The medically needy."

It is noted that this last phrase is not otherwise defined, except by 62 P.S. § 442.1:

"A person shall be considered medically needy if he:

(1) Resides in Pennsylvania, regardless of the duration of his residence or his absence therefrom; and

4. *Section 1983:* "*Civil action for deprivation of rights*"
 Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress."

(2) Meets the standards of financial eligibility established by the department with the approval of the Governor. In establishing these standards the department shall take into account (i) the funds certified by the Budget Secretary as available for medical assistance for the medically needy; (ii) pertinent Federal legislation and regulations; and (iii) the cost of living."

At the hearing before this Court, the parties stipulated that the allegations of fact contained in the Affidavits of R. Stanton Wettick, Jr., Douglass S. Thompson, C. Robert Youngquist, Henry J. Smith, and each of the named Plaintiffs would be accepted as true. From these, it is readily determined that the Plaintiffs had all been certified by the Department as eligible for participation in the PMAP; their pregnancies ranged from six to seventeen weeks; each of the named Plaintiffs were without assets to pay for an abortion or for any examination by physicians other than those at the Hospital or as would be provided by the Hospital; and, none of them were able to meet *all* of the requirements of the Department but, nevertheless, desired abortions. Prior to the issuance of the Injunction, each of the Plaintiffs unsuccessfully attempted to obtain an abortion from the Hospital (Magee-Womens Hospital), and the Hospital advised them that it could not provide the abortions unless, the abortions were either paid for in advance or the particular individuals submitted the documented matters required for reimbursement by the PMAP. The Hospital further advised each of the Plaintiffs that it had no procedures whereby doctors could be provided without charge to the Plaintiffs for the examination required by the PMAP. The Hospital then refused to provide abortions to each of the named Plaintiffs. It was further certified that the Hospital would have provided the abortions if the costs had been reimburseable under the PMAP.

Magee-Womens Hospital is a non-profit institution located in the City of Pittsburgh and is an approved provider of health services under the PMAP. The prior practice of the physicians associated with the Hospital was to schedule abortions within the first eleven weeks of pregnancy because the medical procedures used for abortion during that time period involved significantly lower risks of morbidity and mortality than such procedures at any later stage of pregnancy. The Hospital did not provide abortions to women more than twenty weeks pregnant without special permission and only in extremely unusual cases. Family Planning Services were provided to Medical Assistance recipients, and pharmacists filled prescriptions written by physicians at the Hospital for contraceptives. The costs for these services were reimbursed by the Department, regardless of whether the recipient was married or unmarried.

Following the United States Supreme Court decisions in Roe v. Wade, *supra*, and Doe v. Bolton, 410 U.S. 179, 93 S.Ct. 739, 35 L.Ed.2d 201 (1973) rehearing denied 410 U.S. 959, 93 S.Ct. 1410, 35 L.Ed.2d 694, the Hospital began providing abortions to all Medical Assistance recipients without requiring the documented evidence from a performing physician and two other physicians, and had been submitting claims for reimbursement to the Department (about sixty per month). The Department rejected each of the claims for reimbursement because of the Hospital's failure to comply with the Department's Procedures. Effective October 1, 1973, the Hospital provided abortions only if the patient could pay for the abortion or could furnish the documented medical evidence required by the Department.

The Affidavit of each of the Plaintiffs substantially set forth in similar language that each of the "Does" was unmarried and pregnant and had made the decision not to carry the pregnancy through to birth. Ann Doe elected to have an abortion because of "medical

problems I presently have and also because I do not want any more children." She indicated she was refused abortion because she did not have the money or the necessary documentation. Betty Doe elected abortion "because a birth at my age would be a severe burden on my life as well as my family." Cathy Doe's decision was because "I already have four children and another child would further burden our financial plight and cause severe stress on me." Donna Doe's decision was "because I am still in high school and do not wish to have a baby at this time." Elaine Doe's decision was "because my two children and myself are already in financial difficulty and a birth at this time would be a severe burden on my emotional state." Jane Doe's decision was "because of the burden and interruption to my personal life that the birth would cause." Nancy Doe's decision was "because of the burden and interruption to my personal life that the birth would cause." Patricia, Ruth, Sylvia, and Toni, all had substantially the same reasons as Nancy Doe.

At the hearing, the Three Judge Court requested the Attorney General to secure an affidavit relating to the intention of the Department with respect to any change that might be contemplated regarding its requirements for reimbursement for abortions. Subsequently, an Affidavit was filed by an Assistant Attorney General, to the effect that there was no intention on the part of the Department to change its current policies.

The Three Judge Court also requested the Assistant Attorney General to procure from the United States Department of Health, Education and Welfare, a statement of their position on reimbursement for abortions. He subsequently filed a copy of a Memorandum of the United States as Amicus Curiae in the cases of New York State Department of Social Services, et al. v. Elizabeth Linda Klein, et al., No. 72–770, and Nassau County Medical Center, et al. v. Elizabeth Linda Klein, et al., No. 72–803, October Term 1972, dated May 1973, which took the position, in substance, that the Social Security Act *did not require*, but would not prevent, a Federally funded State Medicaid Program to pay for abortions that were not medically indicated. New York had limited coverage under its Medicaid Program for "the cost of care, services and supplies, which are necessary to prevent, diagnose, correct or cure conditions in the person that cause acute suffering, endanger life, result in illness or infirmity, interfere with his capacity for normal activity, or threaten some significant handicap." The State, in an "administrative letter", interpreted the provision as covering only "necessary and medically indicated care" and, therefore, denied "elective abortions not medically indicated." City of New York v. Wyman, 30 N.Y.2d 537, 330 N.Y.S.2d 385, 281 N.E.2d 180 (1972). No violation of the Federal program was found in this situation.

On December 27, 1973, this Court notified the Attorney General that the Amicus Curiae Brief filed in the *Klein* cases did not satisfy the requirements of the Three Judge Court, and requested that an affidavit be supplied with respect to the position of the Department of H.E.W. on the question of reimbursement of the cost of abortions, whether medically indicated or not. On January 12, 1973, the Assistant Attorney General notified the Court by letter that he was unable to secure the cooperation of the United States with respect to obtaining an affidavit of the type requested by the Court. He stated that the Brief in the *Klein* cases had been submitted in lieu of an affidavit and accurately reflected the position of the United States in the matter. Apparently, however, the Federal Government would share in the costs of abortions under the terms and provisions of the State Medicaid Program.[5]

5. The Attorney General of Pennsylvania in the letter of August 6, 1973, set forth the following at footnote 4 of the letter:

4. "Even before *Wade* and *Bolton, supra,* the Federal statute and regulations permitted reimbursement to the states for

It must be noted that in dealing with the issues in this case we are precluded from the treatment of abortion on moral grounds, nor are we dealing with abortion in its criminal aspects. We must follow the course which recognizes that the law does not represent itself as a moral code, but rather, as a body of rules wherein the majority of the people impose their will, and, within constitutional limits, invade the freedom of the individual, in the interest of public health and welfare. Whatever may be the private view of an individual or group of individuals, or the members of this Court, we are bound by the now established principle of law that a negation of an individual's choice in the matter of abortion during the first trimester of pregnancy is an unwarranted invasion of that person's fundamental rights as established by the Fourteenth Amendment to the Constitution of the United States.

The Supreme Court has said (Roe v. Wade, *supra*, 93 S.Ct. 727, 728):

"This right of privacy, whether it be founded in the Fourteenth Amendment's concept of personal liberty and restrictions upon state action, as we feel it is . . . . in the Ninth Amendment's reservation of rights to the people, is broad enough to encompass a woman's decision whether or not to terminate her pregnancy."

\* \* \* \* \* \*

"Although the results are divided, most of these courts have agreed that the right of privacy, however based, is broad enough to cover the abortion decision; that the right, nonetheless, is not absolute and is subject to some limitations; and that at some point the state interests as to protection of health, medical standards, and prenatal life, become dominant. We agree with this approach."

Thus, we are here concerned with "fundamental rights" which must be balanced against *"compelling* state interests" where legislative enactments including State-wide Regulations pursuant thereto must be narrowly drawn to express only state interests. Kramer v. Union Free School District, 395 U.S. 621, 627, 89 S.Ct. 1886, 1890, 23 L.Ed.2d 583 (1969); Shapiro v. Thompson, 394 U.S. 618, 634, 89 S.Ct. 1322, 1331, 22 L. Ed.2d 600 (1969); Griswold v. Connecticut, 381 U.S. 479, 485, 85 S.Ct. 1678, 1682, 14 L.Ed.2d 510 (1965); Aptheker v. Secretary of State, 378 U.S. 500, 508, 84 S.Ct. 1659, 1664, 12 L.Ed.2d 992 (1964); Sherbert v. Verner, 374 U.S. 398, 406, 83 S.Ct. 1790, 1795, 10 L.Ed.2d 965 (1963); Cantwell v. Connecticut, 310 U.S. 296, 307–308, 60 S.Ct. 900, 904–905, 84 L.Ed. 1213 (1940). See Eisenstadt v. Baird, 405 U.S. 438, 460, 463–464, 92 S.Ct. 1029, 1042, 1043–1044, 31 L.Ed.2d 349 (1972) (White, J., concurring).

## I. STANDING

The Defendants contend that the Plaintiffs have no standing to bring this action seeking reimbursement to the Hospital. Each of the Plaintiffs in this case is a participant in the Medicaid Program established and regulated by Sub-Chapter XIX of the Social Security Act of 1953, as amended, Section 1396 et seq. of Title 42 U.S.C. Each of the Plaintiffs desired an abortion and in

---

the cost of abortions. In response to an inquiry as to whether or not the Federal Government reimbursed the states for abortions under the Medical Assistance Program, the Federal Medical Services Administration, which administers the program, replied:

\* \* \* 'The following statement may be used to describe M.S.A.'s policy on abortions:

The position taken by M.S.A. on abortions is that the Social Security Act and the HEW regulations provide for Federal matching of state expenditures for all kinds of medical care and services, including patient and hospital services, out-patient hospital services, physician services, drugs, etc. If the State Medicare Program paid for these services whether for abortion or any other medical services, the Federal Government shared the cost with the state.' "

none of these cases was there an attempt to fully comply with the requirements of the PMAP. This Court finds that the State's Procedures, limiting reimbursement as indicated, operated to prevent the Plaintiffs from obtaining the abortions they sought. It was admitted that the Hospital would have furnished the Plaintiffs with the abortions. if these abortions had been reimbursable under the PMAP.

At the threshold of the question of standing is the concept recently set forth by the Supreme Court of the United States in Goldberg v. Kelly, 397 U.S. 254, 90 S.Ct. 1011, 25 L.Ed.2d 287 (1970), (involving the determination that procedural due process under the Fourteenth Amendment required an evidentiary hearing before termination of welfare benefits under the Aid to Families with Dependent Children Program (AFDC)), (at footnote 8, 397 U.S. at 262, 90 S.Ct. at 1017, 25 L.Ed.2d at 295):

> "It may be realistic today to regard welfare entitlements as more like 'property' than a 'gratuity.' Much of the existing wealth in this country takes the form of rights that do not fall within traditional common-law concepts of property. It has been aptly noted that '[s]ociety today is built around entitlement. The automobile dealer has his franchise, the doctor and lawyer their professional licenses, the worker his union membership, contract, and pension rights, the executive his contract and stock options; all are devices to aid security and independence. Many of the most important of these entitlements now flow from government: subsidies to farmers and businessmen, routes for airlines and channels for television stations; long term contracts for defense, space, and education; social security pensions for individuals. Such sources of security, whether private or public, are no longer regarded as luxuries or gratuities; to the recipients they are essentials, fully deserved, and in no sense a form of charity. It is

only the poor whose entitlements, although recognized by public policy, have not been effectively enforced.' Reich, Individual Rights and Social Welfare: The Emerging Legal Issues, 74 Yale L.J. 1245, 1255 (1965). See also Reich, The New Property, 73 Yale L.J. 733 (1964)."

The Supreme Court thus held in Goldberg (397 U.S. at p. 261, 90 S.Ct. at p. 1017, 25 L.Ed.2d at pp. 295–297):

> "Appellant does not contend that procedural due process is not applicable to the termination of welfare benefits. Such benefits are a matter of statutory entitlement for persons qualified to receive them. Their termination involves state action that adjudicates important rights. The constitutional challenge cannot be answered by an argument that public assistance benefits are 'a "privilege" and not a "right." ' Shapiro v. Thompson, 394 U.S. 618, 627 n. 6, 89 S.Ct. 1322, 1327, 22 L.Ed.2d 600, 611 (1969). Relevant constitutional restraints apply as much to the withdrawal of public assistance benefits as to disqualification for unemployment compensation, Sherbert v. Verner, 374 U.S. 398, 83 S.Ct. 1790, 10 L.Ed.2d 965 (1963); or to denial of a tax exemption, Speiser v. Randall, 357 U.S. 513, 78 S.Ct. 1332, 2 L.Ed.2d 1460 (1958); or to discharge from public employment, Slochower v. Board of Higher Education, 350 U.S. 551, 76 S. Ct. 637, 100 L.Ed. 692 (1956). The extent to which procedural due process must be afforded the recipient is influenced by the extent to which he may be 'condemned to suffer grievous loss,' Joint Anti-Fascist Refugee Committee v. McGrath, 341 U.S. 123, 168, 71 S.Ct. 624, 647, 95 L.Ed. 817, 852 (1951) (Frankfurter, J., concurring), and depends upon whether the recipient's interest in avoiding that loss outweighs the governmental interest in summary adjudication. Accordingly, as we said in Cafeteria & Restaurant Workers Union v. McElroy, 367 U.S. 886, 895, 81 S.Ct. 1743, 1748–

1749, 6 L.Ed.2d 1230, 1236 (1961), 'consideration of what procedures due process may require under any given set of circumstances must begin with a determination of the precise nature of the government function involved as well as of the private interest that has been affected by governmental action.' See also Hannah v. Larche, 363 U.S. 420, 440, 442, 80 S.Ct. 1502, 1513, 1514, 4 L.Ed.2d 1307, 1320, 1321 (1960).

It is true, of course, that some governmental benefits may be administratively terminated without affording the recipient a pre-termination evidentiary hearing. But we agree with the District Court that when welfare is discontinued, only a pre-termination evidentiary hearing provides the recipient with procedural due process. Cf. Sniadach v. Family Finance Corp., 395 U.S. 337, 89 S.Ct. 1820, 23 L.Ed. 2d 349 (1969). For qualified recipients, welfare provides the means to obtain essential food, clothing, housing, and medical care. Cf. Nash v. Florida Industrial Commission, 389 U.S. 235, 239, 88 S.Ct. 362, 366, 19 L. Ed.2d 438, 442 (1967). Thus the crucial factor in this context—a factor not present in the case of the blacklisted government contractor, the discharged government employee, the taxpayer denied a tax exemption, or virtually anyone else whose governmental entitlements are ended—is that termination of aid pending resolution of a controversy over eligibility may deprive an *eligible* recipient of the very means by which to live while he waits. Since he lacks independent resources, his situation becomes immediately desperate. His need to concentrate upon finding the means for daily subsistence, in turn, adversely affects his ability to seek redress from the welfare bureaucracy."

Relevant constitutional restraints therefore apply to public assistance ben-

efits and their recipients, and there is standing in welfare recipients to challenge State-wide Regulations which exclude welfare recipients who would otherwise be covered by Medical Assistance. Shapiro v. Thompson, *supra*; King v. Smith, *supra*. Cf. Data Processing Service v. Camp, 397 U.S. 150, 90 S.Ct. 827, 25 L.Ed.2d 184 (1970) (holding that the question of standing is the question of whether the interest sought to be protected by the complainant is arguably within the zone of interest to be protected or regulated by the statute or constitutional guarantee in question, 397 U.S. at 152, 90 S.Ct. at 829, 25 L.Ed.2d at 188). When a person or a family has a spiritual stake in First Amendment values sufficient to give standing to raise issues concerning the "establishment" clause and the "free exercise" clause, Abington School District v. Schempp, 374 U.S. 203, 83 S.Ct. 1560, 10 L.Ed.2d 844 (1963); or when standing may reflect "aesthetic, conservational, and recreational, as well as economic values", Office of Communication of United Church of Christ v. F. C. C., 123 U.S.App.D.C. 328, 334–340, 359 F.2d 994, 1000–1006 (1966); then standing certainly arises from the economic injury on which the Petitioners here rely. United States Dept. Agriculture v. Moreno, *supra*; Goldberg v. Kelly, *supra*; Stewart v. Wohlgemuth, 355 F.Supp. 1212 (W.D.Pa.1972). The named Plaintiffs thus have standing to bring the instant action.

## II. CLASS ACTION DETERMINATION.

A difficult question is involved in the determination of the proper class. The Plaintiffs allege that they were females of child bearing age and all were certified by the Department as eligible under the PMAP. The Plaintiffs then allege that they brought this action on behalf of themselves and all others similarly situated pursuant to Rule 23(b)(2) of the Federal Rules of Civil Procedure.[6]

6. Rule 23(b)(2) provides: "the party opposing the class has acted or refused to act on grounds generally applicable to the class, thereby making appropriate final injunctive relief or corresponding declaratory relief with respect to the class as a whole".

The Primary Judge refused to order the case to be maintained as a class action, and deferred the decision of this question to the Three Judge Court.

■ After due consideration, this Court determines that the action shall not be maintained as a class action because the differing individual circumstances which exist would unnecessarily complicate this action, and thus, a class action under Rule 23 Fed.R.Civ.P. would not be a superior method for adjudication of this controversy. See: Tindall v. Hardin, 337 F.Supp. 563 (W.D.Pa. 1972) affirmed sub nominee Carter v. Butz, 479 F.2d 1084 (3rd Cir. 1973). See also Stewart v. Wohlgemuth, *supra*. This is particularly true in light of the considerations which are involved in the "trimester" holdings of the United States Supreme Court in Roe v. Wade, *supra*, and in Doe v. Bolton, *supra*; and the reversal of Klein v. Nassau County Medical Center, 347 F.Supp. 496 (E.D. N.Y.1972) (Three Judge Court), at 412 U.S. 925, 93 S.Ct. 2747, 37 L.Ed.2d 152 (1973), where the judgment was vacated and the case remanded to the United States District Court for further consideration in light of Roe v. Wade, *supra*, and Doe v. Bolton, *supra*.

In view of the fact that the Court is holding the Regulations and/or Procedures of the PMAP to be unconstitutional, as more particularly hereinafter set forth, we are confident that the Defendants will respect the Order of this Court, and we do not at this time need to become involved in the complexities of a class action. Separate actions can be disposed of as they may arise. See Bailey v. Patterson, 369 U.S. 31, 82 S.Ct. 549, 7 L.Ed.2d 512 (1962); Turner v. Colonial Finance Corp., 467 F.2d 202 (1st Cir. 1972). The Court, therefore, directs that the cases not be maintained as a class action.

It is necessary, therefore, with respect to the Plaintiffs here involved, that we decide the two basic attacks made against the Regulations and/or Procedures of the PMAP: (1) that the Pennsylvania Regulations are inconsistent with the Social Security Act, and thereby violate the Supremacy Principle, and (2) that the Pennsylvania Regulations create an unlawful distinction (in violation of the Equal Protection Clause) between indigent women who choose to carry their pregnancies to birth and indigent women who choose to terminate their pregnancies by abortion.

III. THE PENNSYLVANIA MEDICAL ASSISTANCE PROGRAM IS NOT INCONSISTENT WITH THE SOCIAL SECURITY ACT.

The Federal Government makes substantial funds available to those States desiring to participate in the program to provide medical care to individuals and families "whose income and resources are insufficient to meet the costs of necessary medical services", Title XIX of the Social Security Act, 42 U.S.C. § 1396 et seq. Under the Act, participating States are required to provide medical services to individuals and families who are eligible for cash grant assistance under any of the Federal categories of assistance, such as, Aid to the Blind, Aid to the Permanently and Totally Disabled, Old Age Assistance, Aid to Families with Dependent Children, 42 U.S.C. § 1396a(a)(13). These individuals and families are considered the "categorically needy". 45 CFR 249.10(a)(1).

A second group of individuals termed "medically needy" may also benefit under this Act, and is composed of those persons whose income is too great to qualify for cash assistance as "categorically needy", and yet insufficient to meet the costs of medical care. 42 U.S. C. § 1396a(a)(10)(B). This group also consists of individuals benefiting from Federal money available to meet the cost of administration of a Medical Assistance Program, or others who do not come under one of the Federal categories. 45 CFR 248.10(d)(1). As stated before, Pennsylvania has elected to extend medical benefits to the "medically needy". 62 P.S. § 441.1 et seq.

A statutory requirement for participating States is that they must provide certain minimal medical services under the program. For "categorically needy" persons, the State must provide: (1) inpatient hospital services; (2) outpatient hospital services; (3) other laboratory and X-ray services; (4) skilled nursing facility services, screening and diagnosis of children, family planning services and supplies furnished to individuals of child bearing age; and (5) physicians' services furnished by a physician whether in the office, patient's home, hospital or elsewhere. 42 U.S.C. § 1396a(a)(13)(B). For "medically needy" persons, the State has the option of providing from among the above five services, and Pennsylvania has elected to provide the five services as minimal services for the "medically needy", with the exception of the "screening and diagnosis of children."

The Plaintiffs contend that the abortion services which Pennsylvania has limited by its Procedures fall squarely within the category of "physicians' services" which are medically necessary and, therefore, within the requirements of the Social Security Act. Their argument is stated as follows (pp. 20 and 21 Plaintiffs' Brief):

"Under the Federal statutory scheme, inpatient hospital services fall into the same category as physicians' services i. e. they are minimally required for the 'categorically needy' and they are an elective minimal requirement by Pennsylvania as to the 'medically needy.' 42 U.S.C. § 1396a(a)(13) (B) and (C). Inpatient hospital services (other than services in an institution for tuberculosis or mental diseases) are defined as follows by H.E.W. regulations:

'Inpatient hospital services' are those items and services *ordinarily furnished by the hospital* for the care and treatment of inpatients provided under the direction of a physician or dentist in an institution maintained primarily for treatment and care of patients with disorders other than tuberculosis or mental diseases and which is licensed . . . . . 45 C.F.R. 249.10(b)(1) (emphasis added)'

While a hospital may be free under Doe v. Bolton, supra, to refuse to permit abortive surgery within its confines, nothing legally prevents a hospital from including abortions as an 'ordinarily furnished' service. (Magee-Womens Hospital, for example, has been performing abortions on a regular basis.) And under the above H.E.W. regulations, the State is not free to refuse to reimburse hospitals for services they are providing on a regular basis. Consequently, Pennsylvania's policy of refusing reimbursement for abortion services, at least to the extent such reimbursement is for inpatient hospital services, is a violation of Federal law."

\* \* \* \* \* \*

"After the Supreme Court decisions in Roe v. Wade, *supra*, and Doe v. Bolton, *supra*, it is clear that absolutely no State law can constitutionally exclude abortion services from the scope of practice of a physician. Consequently, Pennsylvania's practice of refusing to reimburse for abortion services, at least to the extent such services represent physicians' services, violates the Social Security Act in that it does not provide for the minimum level of coverage required by the Act."

The question remains: Whether the Pennsylvania Procedures governing reimbursement for costs of abortions are compatible with the Federal Statute? We believe this question must be answered in the affirmative.

In order to qualify for Federal funding, state programs must satisfy the requirements of 42 U.S.C. § 1396a, including the requirement of § 1396a(a)(17) that "a state plan for medical assistance must include reasonable standards \* \* \* for determining eligibility for and the extent of medical assistance under the plan which (A) are consistent

with the objectives of this subchapter, * * * ". Physicians' services with regard to an abortion may be considered to fall within the purview of necessary medical services under Title XIX, and the Department does not dispute this fact. While nowhere in the Act is there a specific provision authorizing medical assistance payments for abortions, there are a number of sections that, when considered together with corollary regulations, must be interpreted to permit reimbursement for the costs of abortions performed. These include: 42 U.S.C. § 1396d(a)(1), and 45 CFR 249.10(b)(1) which pertain to inpatient hospital services; 42 U.S.C. § 1396d(a)(5) and 45 CFR 249.10(b)(5) which apply to physicians' services; 42 U.S.C. § 1396d(a)(6) and 45 CFR 249.10(b)(6) which relate to medical care or any other type of remedial care recognized under State law, furnished by licensed practitioners within the scope of their practice as defined by State law; and 42 U.S.C. § 1396d(a)(4) and 45 CFR 249.10(a)(10) which would include services in relation to family planning.

But, even if we assume, as do the Plaintiffs, that abortion payments are clearly authorized under Title XIX of the Social Security Act, nevertheless, Congress has given the States great latitude in establishing standards for the administration of the various plans, under the doctrine of a *"scheme of cooperative federalism."* (Emphasis supplied). N. Y. S. Dept. of Social Services v. Dublino, 413 U.S. 405, 93 S.Ct. 2507, 37 L. Ed.2d 688 (1973) (The Social Security Act does not bar a state from independently requiring individuals to accept employment as a condition for receipt of federally funded aid to families with dependent children); Jefferson v. Hackney, 406 U.S. 535, 92 S.Ct. 1724, 32 L. Ed.2d 285 (1972) (Allowing Texas to grant the full standard of need assistance under Old Age Assistance while granting only 95% of the full standard of need to Aid for Blind and Aid for Permanently and Totally Disabled, and 75% of the full standard of need to Aid

to Families with Dependent Children, AFDC); Cf. King v. Smith, *supra,* (Invalidating the Alabama "substitute father" regulation which denied AFDC payments to children of a mother who "cohabits" in or outside her home with any single or married man, holding that: (392 U.S. at 320, 88 S.Ct. at 2135, 20 L.Ed.2d at 1127))

"Alabama's argument based on its interest in discouraging immorality and illegitimacy would have been quite relevant at one time in the history of the AFDC program. However, subsequent developments clearly establish that these state interests are not presently legitimate justifications for AFDC disqualification. Insofar as this or any similar regulation is based on the State's asserted interest in discouraging illicit sexual behavior and illegitimacy, it plainly conflicts with federal law and policy."

Thus, the question becomes: Whether or not Pennsylvania may, by means of its Regulations and/or Procedures, determine when the performance of an abortion becomes a medical necessity?

In Dandridge v. Williams, 397 U.S. 471, 90 S.Ct. 1153, 25 L.Ed.2d 491 (1970), the Supreme Court of the United States upheld a Maryland maximum grant regulation limiting the total amount of aid any one family unit could receive under the State's Aid to Families with Dependent Children Program (AFDC) against attack on the grounds that it is in conflict with the Social Security Act of 1935 and with the Equal Protection Clause of the Fourteenth Amendment. After referring to the legislative history of the program, the Court determined that Maryland was entitled to establish its own standard of need with regard to each eligible family unit without contravening the purposes of the AFDC Program, holding as follows (397 U.S. at pp. 475–479, 90 S.Ct. at pp. 1156–1158, 25 L.Ed.2d at pp. 496–498):

"In its original opinion the District Court held that the Maryland regula-

tion does conflict with the federal statute, and also concluded that it violates the Fourteenth Amendment's equal protection guarantee. After reconsideration on motion, the court issued a new opinion resting its determination of the regulation's invalidity entirely on the constitutional ground. Both the statutory and constitutional issues have been fully briefed and argued here, and the judgment of the District Court must, of course, be affirmed if the Maryland regulation is in conflict with either the federal statute or the Constitution. We consider the statutory question first, because if the appellees' position on this question is correct, there is no occasion to reach the constitutional issues. Ashwander v. TVA, 297 U.S. 288, 346–347, 56 S. Ct. 466, 482–483, 80 L.Ed. 688, 710, 711 (Brandeis, J., concurring); Rosenberg v. Fleuti, 374 U.S. 449, 83 S. Ct. 1804, 10 L.Ed.2d 1000.

### I.

The appellees contend that the maximum grant system is contrary to § 402(a)(10) of the Social Security Act, as amended, which requires that a state plan shall 'provide . . . that all individuals wishing to make application for aid to families with dependent children shall have opportunity to do so, and that aid to families with dependent children shall be furnished with reasonable promptness to all eligible individuals.' The argument is that the state regulation denies benefits to the younger children in a large family. Thus, the appellees say, the regulation is in patent violation of the Act, since those younger children are just as 'dependent' as their older siblings under the definition of 'dependent child' fixed by federal law. See King v. Smith, 392 U.S. 309, 88 S.Ct. 2128, 20 L.Ed.2d 1118. Moreover, it is argued that the regulation, in limiting the amount of money any single household may receive, contravenes a basic purpose of the federal law by encouraging the parents of large families to 'farm out' their children to relatives whose grants are not yet subject to the maximum limitation.

It cannot be gainsaid that the effect of the Maryland maximum grant provision is to reduce the per capita benefits to the children in the largest families. Although the appellees argue that the younger and more recently arrived children in such families are totally deprived of aid, a more realistic view is that the lot of the entire family is diminished because of the presence of additional children without any increase in payments. Cf. King v. Smith, supra, at 335 n. 4, [88 S.Ct. 2128, at 2142] 20 L.Ed.2d at 1135 (Douglas, J., concurring). It is no more accurate to say that the last child's grant is wholly taken away than to say that the grant of the first child is totally rescinded. In fact, it is the *family* grant that is affected. Whether this per capita diminution is compatible with the statute is the question here. For the reasons that follow, we have concluded that the Maryland regulation is permissible under the federal law.

In King v. Smith, *supra*, we stressed the States' 'undisputed power,' under these provisions of the Social Security Act, 'to set the level of benefits and the standard of need.' Id., at 334, [88 S.Ct. 2128, at 2142] 20 L.Ed.2d at 1135. We described the AFDC enterprise as 'a scheme of cooperative federalism,' id., at 316, [88 S.Ct. 2128, at 2133] 20 L.Ed.2d at 1125, and noted carefully that '[t]here is no question that States have considerable latitude in allocating their AFDC resources, since each State is free to set its own standard of need and to determine the level of benefits by the amount of funds it devotes to the program.' Id., at 318–319, [88 S. Ct. 2128 at 2134] 20 L.Ed.2d at 1126."

In the case before this Court, as noted previously, Congress was silent with respect to specific authorization of medical

assistance for abortions. Pennsylvania standards must be scrutinized without curtailment by Congressional action and the State Regulations and/or Procedures must be given great latitude in providing for the administration of the Program. We, therefore, feel compelled to find Pennsylvania's Regulations do not conflict with Title XIX of the Social Security Act.

## IV. PENNSYLVANIA'S PROCEDURES RESTRICTING MEDICAL REIMBURSEMENT FOR ABORTIONS VIOLATE EQUAL PROTECTION CLAUSE OF FOURTEENTH AMENDMENT

The Plaintiffs further contend that since pregnant women need medical services in connection with their pregnancies, a distinction between indigent pregnant women who choose to carry their pregnancies to birth and indigent pregnant women who choose to terminate their pregnancies by abortion, deprive women who choose abortion of their equal protection rights guaranteed by the Fourteenth Amendment to the United States Constitution.

The Supreme Court in a recent decision of Cleveland Board of Education et al. v. Jo Carol LaFleur et al., and Susan Cohen v. Chesterfield County School Board, et al., 414 U.S. 632, 94 S.Ct. 791, 39 L.Ed.2d 52, decided January 21, 1974, in an Opinion by Justice Stewart, speaking for Mr. Justices Brennan, White, Marshall, and Blackmun, and concurred in by Justice Douglas, held unconstitutional certain regulations of Cleveland, Ohio and Chesterfield County, West Virginia, relating to mandatory leave rules applied to pregnant school teachers and stated the following (at p. 4189 [94 S. Ct. at p. 796]):

"This Court has long recognized that freedom of personal choice in matters of marriage and family life is one of the liberties protected by the Due Process Clause of the Fourteenth Amendment. Roe v. Wade, 410 U.S. 113 [93 S.Ct. 705, 35 L.Ed.2d 147];

Loving v. Virginia, 388 U.S. 1, 12 [87 S.Ct. 1817, 1823, 18 L.Ed.2d 1010]; Griswold v. Connecticut, 381 U.S. 479 [85 S.Ct. 1678, 14 L.Ed.2d 510]; Pierce v. Society of Sisters, 268 U.S. 510 [45 S.Ct. 571, 69 L.Ed. 1070]; Meyer v. Nebraska, 262 U.S. 390 [43 S.Ct. 625, 67 L.Ed. 1042]. See also Prince v. Massachusetts, 321 U.S. 158, [64 S. Ct. 438, 88 L.Ed. 645]; Skinner v. Oklahoma, 316 U.S. 535 [62 S.Ct. 1110, 86 L.Ed. 1655]. As we noted in Eisenstadt v. Baird, 405 U.S. 438, 453 [92 S.Ct. 1029, 31 L.Ed.2d 349], there is a right 'to be free from unwarranted governmental intrusion into matters so fundamentally affecting a person as the decision whether to bear or beget a child.'

By acting to penalize the pregnant teacher for deciding to bear a child, overly restrictive maternity leave regulations can constitute a heavy burden on the exercise of these protected freedoms. Because public school maternity leave rules directly affect 'one of the basic civil rights of man,' Skinner v. Oklahoma, supra [316 U.S.], at 541 [62 S.Ct. 1110, at 1113] the Due Process Clause of the Fourteenth Amendment requires that such rules must not needlessly, arbitrarily, or capriciously impinge upon this vital area of a teacher's constitutional liberty."

Under traditional Equal Protection standards, once the State chooses to pay for medical services rendered in connection with the pregnancies of some indigent women, it cannot refuse to pay for the medical services rendered in connection with the pregnancies of other indigent women electing abortion, unless the disparate treatment supports a legitimate State interest. United States Dept. of Agriculture v. Moreno, supra; Weber v. Aetna Casualty & Surety Co., 406 U.S. 164, 92 S.Ct. 1400, 31 L.Ed.2d 768 (1972); Reed v. Reed, 404 U.S. 71, 92 S.Ct. 251, 30 L.Ed.2d 225 (1971); Eisenstadt v. Baird, supra. The Court in King v. Smith, supra, well summarized public welfare policy as follows

(392 U.S. at pp. 320, 323, 88 S.Ct. at pp. 2135, 2137, 20 L.Ed.2d at pp. 1127, 1130):

"A significant characteristic of public welfare programs during the last half of the 19th century in this country was their preference for the 'worthy' poor. Some poor persons were thought worthy of public assistance, and others were thought unworthy because of their supposed incapacity for 'moral regeneration.' H. Leyendecker, Problems and Policy in Public Assistance 45–57 (1955); Wedemeyer & Moore, The American Welfare System, 54 Calif.L.Rev. 326, 327–328 (1966). This worthy-person concept characterized the mothers' pension welfare programs, which were the precursors of AFDC. See W. Bell, Aid to Dependent Children 3–19 (1965). Benefits under the mothers' pension programs, accordingly, were customarily restricted to widows who were considered morally fit. See Bell, *supra*, at 7; Leyendecker, *supra*, at 53."

\* \* \* \* \* \*

"The most recent congressional amendments to the Social Security Act further corroborate that federal public welfare policy now rests on a basis considerably more sophisticated and enlightened than the 'worthy-person' concept of earlier times. State plans are now required to provide for a rehabilitative program of improving and correcting unsuitable homes, § 402(a), as amended by § 201(a)(1)(B), 81 Stat. 877, 42 USC § 602(a)(14) (1964 ed., Supp. III); § 406, as amended by § 201(f), 81 Stat. 880, 42 USC § 606 (1964 ed. Supp. III); to provide voluntary family planning services for the purpose of reducing illegitimate births, § 402(a), as amended by § 201(a)(1)(C), 81 Stat. 878, 42 USC § 602(a)(15) (1964 ed., Supp. III); and to provide a program for establishing the paternity of illegitimate children and securing support for

them, § 402(a), as amended by § 201(a)(1)(C), 81 Stat. 878, 42 USC § 602(a)(17) (1964 ed., Supp. III)."

Pennsylvania seeks to sustain its Procedures not on the basis that there is a lack of discrimination, but that there is no "invidious" discrimination and that the Procedures are rationally supportable on valid grounds.

The Department first of all contends that in the area of economics and social welfare, a State does not violate the Equal Protection Clause merely because the classifications made by its laws are imperfect. The Department states in its Brief (at p. 8):

" . . . A legislature may address a problem one step at a time or even select one phase of one field and apply a remedy there, neglecting others. So long as its judgments are rational, and not invidious, the legislature's efforts to tackle the problems of the poor and the needy are not subject to a constitutional straightjacket. The very complexity of the problems suggests that there will be more than one constitutionally permissible method of solving them." Citing Dandridge v. Williams, *supra*; Jefferson v. Hackney, *supra*.

An analysis of Dandridge v. Williams, *supra*, however, does not give support to the State's contention in this case. In *Dandridge*, a fiscal basis was found by the Court for the State's interest in encouraging employment and avoiding discrimination between welfare families and the families of the working poor; for by combining the limit on a recipient's grant with permission to retain money earned, without reduction in the amount of the grant, Maryland provided an incentive to seek gainful employment. Certainly, no such fiscal interest can be promoted in the instant case where it is obvious that the cost of an abortion may well be far less than the cost of prenatal care, childbirth, and post partum treatment. Yet the State will pay the latter costs for any Medical Assistance recipient who does not elect abortion.

The Supreme Court in Hagans v. Lavine, Commissioner of New York State Department of Social Services, 42 L.W. 4381 at 4385, 415 U.S. 528 at 539, 94 S. Ct. 1372, at 1380, 39 L.Ed.2d 577, had this to say about the *Dandridge* case:

"In Dandridge v. Williams, *supra*, AFDC recipients challenged the Maryland maximum grant regulation on equal protection grounds. We held that the issue should be resolved by inquiring whether the classification had a rational basis. Finding that it did, we sustain the regulation. But *Dandridge* evinced no intention to suspend the operation of the Equal Protection Clause in the field of social welfare law. State laws and regulations must still 'be rationally based and free from invidious discrimination.' 397 U.S. at 487 [90 S.Ct., at 1162]. See Jefferson v. Hackney, 406 U.S. 535, 546 [92 S.Ct. 1724, 1731, 32 L.Ed.2d 285] (1972); Carter v. Stanton, *supra*, 405 U.S. [669], at 671 [92 S.Ct. 1232, 31 L.Ed.2d 569]; cf. San Antonio School District v. Rodriguez, 411 U.S. 1 [93 S.Ct. 1278, 36 L.Ed.2d 16] (1973)."

■ Of course, a State cannot justify on the basis of fiscal integrity a regulation which would exclude a woman from Medical Assistance reimbursement because she has decided to exercise a constitutional right related to the decision as to whether to bear or beget a child. Thus, in Shapiro v. Thompson, *supra*, (which involved a residency requirement), the Court stated as follows (394 U.S. at pp. 631, 632, 89 S.Ct. at pp. 1329, 1330, 22 L.Ed.2d at pp. 613, 614):

"Alternatively, appellants argue that even if it is impermissible for a State to attempt to deter the entry of all indigents, the challenged classification may be justified as a permissible state attempt to discourage those indigents who would enter the State solely to obtain larger benefits. We observe first that none of the statutes before us is tailored to serve that objective. Rather, the class of barred newcomers is all-inclusive, lumping the great majority who come to the State for other purposes with those who come for the sole purpose of collecting higher benefits. In actual operation, therefore, the three statutes enact what in effect are nonrebuttable presumptions that every applicant for assistance in his first year of residence came to the jurisdiction solely to obtain higher benefits. Nothing whatever in any of these records supplies any basis in fact for such a presumption.

More fundamentally, a State may no more try to fence out those indigents who seek higher welfare benefits than it may try to fence out indigents generally. Implicit in any such distinction is the notion that indigents who enter a State with the hope of securing higher welfare benefits are somehow less deserving than indigents who do not take this consideration into account. But we do not perceive why a mother who is seeking to make a new life for herself and her children should be regarded as less deserving because she considers, among other factors, the level of a State's public assistance. Surely such a mother is no less deserving than a mother who moves into a particular State in order to take advantage of its better educational facilities."

\* \* \* \* \* \*

"We recognize that a State has a valid interest in preserving the fiscal integrity of its programs. It may legitimately attempt to limit its expenditures, whether for public assistance, public education, or any other program. But a State may not accomplish such a purpose by invidious distinctions between classes of its citizens. It could not, for example, reduce expenditures for education by barring indigent children from its schools. Similarly, in the cases before us, appellants must do more than show that denying welfare benefits to new

residents saves money. The saving of welfare costs cannot justify an otherwise invidious classification."

█ The Assistant Attorney General also contends that since the basic requirements as set forth in the Department's Procedures were those approved by the Joint Commission on Accreditation of Hospitals that, therefore, "An examination of the requirements clearly reveals that although they may not serve with mathematical nicety, there can be no doubt that the instances where the Commonwealth will pay for an abortion are reasonable and logical. These requirements are set forth not by judges or lawyers, but by doctors who are immediately concerned with the problems of abortion." (Defendant's Brief p. 9). The difficulty with this position is that in this case we are not concerned with the views that doctors may have on the question of where, or under what circumstances, they might best choose to perform abortions. In each of the individual Plaintiff's allegations, as admitted by the Defendants, there were doctors available who did not consider it necessary that there be concurrence by two other physicians before the abortion was performed. These doctors did not consider that the abortion was necessary because of a threat to the health of the patient if the pregnancy was carried to term, or that it was necessary because the infant might be born with an incapacitating physical deformity or mental deficiency, or that it was necessary because the pregnancy resulted from statutory or forcible rape, which may have constituted a threat to the mental or physical health of the patient.

█ Roe v. Wade, *supra*, must be considered as dispositive of the contentions in the instant case. The Supreme Court held that the right of privacy was broad enough to include the abortion decision. (410 U.S. 153, 154, 93 S.Ct. 727, 35 L.Ed.2d 177). Freedom of choice was recognized as a fundamental right during the first three months of pregnancy to be exercised by the pregnant woman in consultation with her physician free from State interference. The Court stated (410 U.S. at 163, 93 S.Ct. at 732, 35 L.Ed.2d at 183):

"This means, . . . that, for the period of pregnancy prior to this 'compelling' point, *the attending physician, in consultation with his patient, is free to determine, without regulation by the State, that in his medical judgment the patient's pregnancy should be terminated.* If that decision is reached, the judgment may be effectuated by an abortion free of interference by the State." (Emphasis added)

During this first trimester, State regulations impinging in any manner with a fundamental right must be examined with close scrutiny by the Courts. Thereafter, however, the State's legitimate interest in potential life becomes *compelling* and the State may reasonably regulate. The Court held (410 U.S. at p. 163, 93 S.Ct. at pp. 731–732, 35 L.Ed. 2d at pp. 182, 183):

"With respect to the State's important and legitimate interest in the health of the mother, the 'compelling' point, in the light of present medical knowledge, is at approximately the end of the first trimester. * * * It follows that, from and after this point, a State may regulate the abortion procedure to the extent that the regulation reasonably relates to the preservation and protection of maternal health. Examples of permissible state regulation in this area are requirements as to the qualifications of the person who is to perform the abortion; as to the licensure of that person; as to the facility in which the procedure is to be performed, that is, whether it must be a hospital or may be a clinic or some other place of less-than-hospital status; as to the licensing of the facility; and the like."

Therefore, since the PMAP serves to regulate the elective decision of the pregnant woman and her doctor

*throughout the three trimesters,* they are too broad and overreach the State's legitimate interest.

In the original Temporary Restraining Order, the relief that was granted was rather broad in nature. This was done in consideration of the fact that most of the Plaintiffs were in their first trimester of pregnancy; the few remaining Plaintiffs were not beyond their seventeenth week of pregnancy. These facts were considered along with the Affidavit of Douglass S. Thompson, an Associate Professor of Obstetrics and Gynecology at the University of Pittsburgh School of Medicine, the Director of the Division of Community Health at Magee-Womens Hospital and the Medical Director, Ob-Gyn Medical Care Center of Magee-Womens Hospital. In his Affidavit he stated that:

> "It is the practice of all physicians associated with Magee-Womens Hospital to schedule abortions within the first eleven weeks of pregnancy if possible."

> \* \* \* \* \* \*

> "Magee-Womens Hospital will not provide abortions to women who are more than twenty weeks pregnant without special permission for extremely unusual cases."

As for the accompanying Order, we intend to require payment by the PMAP for only elective abortions where the mother is *in* the first trimester of her pregnancy and *not* beyond the twelfth week of said pregnancy. The Plaintiffs in their "Prayer for Relief" sought *inter alia:*

> "This Court preliminarily and permanently enjoin defendants from refusing to pay the reasonable costs of abortion services prescribed by a qualified physician and provided to women eligible for Medical Assistance."

After carefully scrutinizing the Regulations of PMAP and after reaching the conclusions that these Regulations do impinge on a fundamental right in the first trimester, the relief sought must be limited to that particular part of the pregnancy.

■ Pennsylvania has further contended that the PMAP covers only *necessary* medical services because of a need to conserve hospital space and State funds. We believe, however, that the Supreme Court in Roe v. Wade, *supra,* recognized that abortion is a necessary medical service for it may prevent specific and direct harm which is medically diagnosable (e. g. psychological harm), may protect the woman's future mental and physical health, and may prevent the distress associated with the unwanted pregnancy and child. (410 U.S. at p. 153, 93 S.Ct. at 727, 35 L.Ed. 2d at 177). Furthermore, every pregnant woman requires medical services in connection with her pregnancy. The expense of these services, the need for the use of more extensive hospital facilities, and the risk to the woman's health all increase as the pregnancy advances toward term. The State's classification of what is medically necessary must have some reasonable relation to the rationale behind the classification, and the non-therapeutic abortion, in the light of the *Roe* decision, cannot be validly classified as unnecessary.

As was stated by the District Court in Klein v. Nassau County Medical Center, *supra* (347 F.Supp. at p. 500):

> " \* \* \* Pregnancy is a condition which in today's society is universally treated as requiring medical care, prenatal, obstetrical and post-partum care, and undeniably it is provided under the Medicaid program as 'necessary' medical assistance although pregnancy is not an abnormal condition, nor does the medical assistance in childbirth 'cure' it. Medical assistance for abortion is not less 'necessary' because an election to bear the child would obviate that medical assistance and require instead other, more extensive and more expensive medical assistance. The pregnant woman may not be denied necessary medical assistance because she has

made an unwarrantedly disfavored choice, and no other basis appears here for denying Medical Assistance. Eisenstadt v. Baird, 1972, 405 U.S. 438, 452–453, 92 S.Ct. 1029, 31 L.Ed. 2d 349. State law articulates no policy that authorizes disfavoring one choice, and none other than the invalid argument based on the word 'necessary' is advanced."

 It cannot be argued at this time that the justification for denying benefits to indigent women, who wish to terminate their pregnancies by abortion, is to discourage abortion. It is noted that the PMAP, by limiting Medical Assistance reimbursement of abortion costs does not distinguish between married pregnant women and unmarried pregnant women. In Roe v. Wade, *supra,* the Court suggested that discouraging illicit sexual conduct is not a serious argument for justifying restrictions on abortions; nor would there be any such nexus here. In Doe v. Rampton, 366 F. Supp. 189 (D.C.Utah 1973) a District Court held unconstitutional a Utah limitation on medical assistance coverage to therapeutic abortions ruling that the Plaintiff "would be denied equal protection of the law if the defendant, his agents and employees are permitted to discriminate between 'therapeutic' and 'non-therapeutic' abortions in the administration of the Medicaid Program." See also Comment, Abortion on Demand in Post-Wade Context: Must the State Pay the Bills? 41 Fordham Law Review 921 (1973). We hold that the State's decision to limit coverage to "medically indicated" abortions, as arbitrarily determined by it, is a limitation which promotes no valid State interest. In the PMAP, the State has instituted a program to provide benefits to the poor; the State has excluded certain of the poor from the program; the exclusion denies Medical Assistance benefits to otherwise eligible applicants solely because they have elected to have an abortion, and the State has been unable to show that the exclusion of such persons promotes a compelling State interest. Shapiro v. Thompson, *supra.*

In Hathaway v. Worcester City Hospital, 475 F.2d 701, at pp. 705, 706 (1st Cir. 1973), the Court stated as follows:

"But it seems clear, after *Roe* and *Doe,* that a fundamental interest is involved, requiring a compelling rationale to justify permitting some hospital surgical procedures and banning [the hospital here had a policy of barring use of facilities for sterilization operations] another involving no greater risk or demand on staff and facilities. While *Roe* and *Doe* dealt with a woman's decision whether or not to terminate a particular pregnancy, a decision to terminate the possibility of any future pregnancy would seem to embrace all of the factors deemed important by the Court in *Roe* in finding a fundamental interest, 410 U.S. at 155, 93 S.Ct. 705, but in magnified form, particularly so in this case given the demonstrated danger to appellant's life and the eight existing children."

\* \* \* \* \* \*

"We are merely saying, consistent with the Supreme Court's reasoning in *Shapiro* with regard to welfare payments, that once the state has undertaken to provide general short-term hospital care, as here, it may not constitutionally draw the line at medically indistinguishable surgical procedures that impinge on fundamental rights."

For the aforementioned reasons, we conclude that the Regulations and/or Procedures of the Pennsylvania Medical Assistance Program are unconstitutional because they are in violation of the Equal Protection Clause since they create an unlawful distinction between indigent women who choose to carry their pregnancies to birth, and indigent women who choose to terminate their pregnancies by abortion.

We further conclude that the State may not, by means of any statutes, regu-

lations or procedures similar to those comprising the Pennsylvania Medical Assistance Program, unlawfully impinge upon the fundamental rights of any pregnant woman during the first three months or trimester of her pregnancy.

. We do not here decide, as the Dissent would indicate, that the Commonwealth of Pennsylvania is constitutionally unable to limit its expenditures for medical services to those which are medically necessary simply because we hold that payments must be made for "elective" abortions. Rather we hold that the Commonwealth has already determined that the condition of pregnancy brings about the necessity of medical services. The Commonwealth cannot then discriminate with respect to the methods of treatment for that condition, for in the first trimester of pregnancy, Roe v. Wade, *supra,* the selection of the method of treatment is the inviolable fundamental right of the physician and the patient.

It could not be controverted that if the Commonwealth adopted a regulation denying payment for medical services for the birth of an illegitimate child and, at the same time, provided payment for medical services for an abortion to prevent such a birth—such a regulation, which is but the other side of the same coin, would clearly be an unconstitutional discrimination. It is, therefore, the meaning of this Opinion that the Commonwealth has invidiously discriminated among persons equally eligible for assistance against those who seek medical treatment within the confines of a fundamental right.

As agreed by the Dissent, we are not to determine the presence or absence of a compelling State interest in the first trimester of pregnancy—the Supreme Court of the United States has eliminat-

ed this problem in declaring the fundamental right of the physician and patient as being paramount to the interest of the State. We do not hold that the State must finance a fundamental right, but we do hold that the expression of that fundamental right cannot be the basis for invidious discrimination.

An appropriate order will be entered.

WEIS, Circuit Judge (dissenting):

As I view it, the effect of the majority opinion is that the Commonwealth of Pennsylvania is constitutionally unable to limit its expenditures for medical services to those which are medically necessary. I do not agree and respectfully dissent.[1]

Preliminarily, it must be understood that we are not to determine if the qualified right to obtain an abortion is a fundamental constitutional right. That question has been foreclosed by the United States Supreme Court decision in Roe v. Wade, 410 U.S. 113, 93 S.Ct. 705, 35 L.Ed.2d 147 (1973). Its invocation here obscures the basic issue—is the State required to pay for an elective, nonmedically necessary abortion when it does not fund other medically non-necessary services.

Insofar as the factual background is concerned, it was made clear at oral argument that the basic issue in this case centers around "elective" abortions, that is, those situations where there is no evidence of harm to the life or to the physical or emotional health of the mother. If those factors were involved, then Pennsylvania would pay for the necessary services and that matter is not at issue here.[2] Therefore, the point that I address is the situation where there is no threat to the life or health of the mother and the election of an abortion is

---

1. I agree that under Super Tire Engineering Co. v. McCorkle, 42 U.S.L.W. 4507, —— U.S. ——, 94 S.Ct. 1694, 40 L.Ed.2d 1 (1974), the plaintiffs have standing. I also concur in the court's finding that the State regulations are not in conflict with the federal statute.

2. The Commonwealth asserts that it does pay the fees of physicians to perform the preliminary examination and the contentions of the plaintiffs to the contrary appear to be in error.

purely because of personal preference.[3] Thus, the question here is not whether the State may prohibit certain categories of abortions by statute or practice. It does not do so. The issue is whether the Constitution has thrust upon Pennsylvania an affirmative burden to pay for an elective abortion because the legislature has decided that the State will pay for those abortions for the indigent arising from medical necessity. My conclusion is in the negative because there is no constitutional requirement that the State must finance the exercise of a "fundamental" right, nor does a classification which distinguishes between medically necessary and non-necessary abortions offend the Equal Protection Clause.

That the State has an affirmative duty to pay for the implementation of fundamental rights is, with certain narrowly carved exceptions, contrary to the weight of constitutional authority. The unusual situation may be typified by Griffin v. Illinois, 351 U.S. 12, 76 S.Ct. 585, 100 L.Ed. 891 (1956), requiring that an indigent criminal defendant be furnished with transcripts at State expense. In an analogous situation, Boddie v. Connecticut, 401 U.S. 371, 91 S.Ct. 780, 28 L.Ed.2d 113 (1971), held that an indigent could not be barred from securing a divorce because of inability to pay State assessed filing fees. To be precise, the State was not required to pay the fees but to forego collecting them.[4] The common element to these cases in this carefully limited category is a State "monopoly" on the effective forum, i. e., the courts. It is crucial here that the State has no monopoly on performing abortions and in fact is not in the business to any degree. It is only the money from the State which is at issue and the absence of State funds, on this record, will not absolutely prevent the plaintiffs from obtaining the services which they desire.[5] It is important, also, in keeping this case in perspective to realize that there is nothing other than its own desire to be recompensed which prevented the Magee-Womens Hospital from performing these procedures. The State created no obstacle, the hospital did. State money may make it easier and more convenient to obtain an abortion but that is not a legitimate basis for creating a constitutional mandate.

With the exception of the narrow area referred to, it is clear that there is no constitutional requirement that a State must fund fundamental rights. A scrutiny of representative Supreme Court determinations on the "fundamental" right classification, including those in the right of privacy category, demonstrates no corollary of required State subsidy.

While Shapiro v. Thompson, 394 U.S. 618, 89 S.Ct. 1322, 22 L.Ed.2d 600 (1969),[6] found the right to travel among

---

3. There is no question that the issue does not arise as to the second or third trimester because of the Roe v. Wade, *supra*, decision limiting its thrust to the first trimester.

4. The later cases of United States v. Kras, 409 U.S. 434, 93 S.Ct. 631, 34 L.Ed.2d 626 (1973), and Ortwein v. Schwab, 410 U.S. 656, 93 S.Ct. 1172, 35 L.Ed.2d 572 (1973), indicate that this principle would not be extended to cover such matters as bankruptcy and state appellate court filing fees in civil cases. Note the distinction between requiring the state to pay out money, as in the transcript cases, as compared to the situation where the state has imposed a monetary obstacle, e. g., filing fee. Similarly, one must recognize that there may be a difference between cases arising under the due process clause and those based on equal protection.

5. It may be assumed that various non-profit organizations interested in advancing their point of view of the desirability of abortions on demand realistically could be expected to give financial assistance if approached. While it has been urged that the existence of private charitable funds should not enter into consideration of cases involving welfare rights, for example, it is an element which points out that payment of monies, not the exercise of fundamental rights, is the point of issue here.

6. Shapiro found a residency requirement invalid when it prevented a welfare recipient from receiving payments needed for "the very means to subsist—food, shelter, and

the states to be fundamental, no suggestion has been made that transportation charges for the indigent must be paid by the State.

While a person may have a fundamental right of privacy to have obscene material in his home, Stanley v. Georgia, 394 U.S. 557, 89 S.Ct. 1243, 22 L.Ed.2d 542 (1969), there have been no serious contentions that the State must furnish such material for the indigent. The fundamental rights of freedom of speech and of the press impose no duty on the State to purchase public address systems or printing presses for those unable to pay for them.

I have elaborated perhaps more than necessary the point that although a right may be classified as "fundamental," there is no inherent requirement that there be financial implementation by the State. The principle is important here because it is only when a fundamental right is sought to be regulated or restricted that the State must show a compelling interest to justify its action. In applying such a standard to a purely funding situation, I believe the majority errs.[7]

Absent a fundamental constitutional right basis, the plaintiffs' claim of deni-al of equal protection must necessarily be analyzed within the less restrictive requirement of a rational relationship to a legitimate governmental interest. Jefferson v. Hackney, 406 U.S. 535, 92 S.Ct. 1724, 32 L.Ed.2d 285 (1971), Richardson v. Belcher, 404 U.S. 78, 92 S.Ct. 254, 30 L.Ed.2d 231 (1971), Dandridge v. Williams, 397 U.S. 471, 90 S.Ct. 1153, 25 L. Ed.2d 491 (1970).

Simply stated, it is Pennsylvania's position that it will fund only medically necessary procedures for the poor. The State has not chosen to provide a plan of total, comprehensive, all-encompassing medical care for those who meet the indigency requirements.[8] It does not aim to provide such services as may be "elective" or merely desired. While a financial basis for such a broad policy is obvious, another consideration may be the additional strain on limited medical facilities and resources. Nor can we ignore the difficult legislative judgment as to where to draw the line so that the medical services furnished without charge to the indigent are not so grossly disproportionate to those which may be available to those who, while not indigent, have little money to pay for necessary care, let alone electives, after paying for the absolute necessities of life.[9]

other necessities of life," 394 U.S. at 627. Memorial Hospital v. Maricopa County, 415 U.S. 250, 94 S.Ct. 1076, 39 L.Ed.2d 306, 42 U.S.L.W. 4277 (1974), similarly struck down residency requirements when used to deny medical care which was *necessary* for the preservation of health. But in Vlandis v. Kline, 93 S.Ct. 2230, 37 L.Ed.2d 63 (1973), a residency requirement affecting the amount of tuition to be paid at a State university was not found to be a per se restriction on the right to travel.

7. *See* page 191. Similarly, Hathaway v. Worcester City Hospital, 475 F.2d 701 (1st Cir. 1973), is distinguishable because funding was not the issue. Roe v. Rampton, 366 F. Supp. 189 (D.Utah 1973), did not meet the issue involved here. In that case the State refused to pay for all abortions. Cleveland Board of Education v. LaFleur, 414 U.S. 632, 94 S.Ct. 791, 39 L.Ed.2d 52, 42 U.S.L.W. 4186 (1974), was decided on the basis of due process and the use of irrebuttable presumptions to penalize a fundamental right. There the plaintiffs were deprived of

wages and employment opportunities because of their decision to bear a child. Here, the plaintiffs are not being deprived of welfare rights or of income because of their decision to have an abortion.

8. "The Department of Public Welfare pays for those types of medical and allied services given in the home, office, clinic, or hospital, that are recognized as necessary treatment of illness."

\*　　\*　　\*　　\*　　\*

"There is no intention to pay for extravagant or superfluous medical care, or care that would be beyond the means of the average family of moderate income." Section 9100(E)(1) DEPARTMENT OF PUBLIC WELFARE–PENNSYLVANIA MANUAL.

9. In this context, we find the comment of Justice Powell, although dealing with education, most apt:
"The ultimate wisdom as to these and related problems of education is not likely to be devined for all time even by the scholars

Having once established a valid basis for its general policy, *e. g.,* payment for only necessary medical expenses, the State does not violate the Equal Protection Clause if the classification is imperfect, lacks mathematical exactness, or in practice may result in some inequities. Jefferson v. Hackney, *supra,* Dandrige v. Williams, *supra.*

While the plaintiffs contend that elective abortions are ultimately less costly than prenatal, delivery, and postnatal services, I do not find this monetary argument convincing. It may be argued just as forcefully that from the financial standpoint allowing the child to be born will produce a tax paying citizen whose contribution to the State in his lifetime will exceed many times his cost of delivery.

A conspicuous example of the limited scope of the State's funding of medical services for the indigent is the refusal to pay for elective cosmetic surgery.[10] No one contends that this practice offends the Equal Protection Clause even though such services have been paid by the State in some instances when found to be medically necessary.

Surely, no one can argue seriously that in view of the holding that the right to have an abortion has been found to be a fundamental one, the right to receive plastic surgery is not equally so. There can be no doubt that an attempt by a State to impose criminal sanctions upon those seeking or administering such procedures would be struck down as unconstitutional. And yet that consideration does not transform what is an elective into a medically necessary operation. The majority's reasoning that dictum in Roe v. Wade, *supra,* makes all abortions, elective or not, into medically necessary ones is logically and factually erroneous.

In the usual equal protection case the State is presumed to have acted within its constitutional powers, even though in practice some inequality may have resulted. Lindsey v. Normet, 405 U.S. 56, 92 S.Ct. 862, 31 L.Ed.2d 36 (1971). A statutory discrimination may not be invalidated if any set of facts may reasonably be conceived to justify it. McGowan v. Maryland, 366 U.S. 420, 81 S. Ct. 1101, 6 L.Ed.2d 393 (1960). It is not every classification but only an invidious one that runs afoul of the Equal Protection Clause. Jefferson v. Hackney, *supra.*

A classification based on whether a procedure is medically necessary or unnecessary is not invidious. I dissent.

---

who now so earnestly debate the issues. In such circumstances the judiciary is well advised to refrain from interposing on the States inflexible constitutional restraints that could circumscribe or handicap the continued research and experimentation so vital to finding even partial solutions . . .

and to keeping abreast of ever changing conditions." San Antonio School District v. Rodriguez, 411 U.S. 1, 43, 93 S.Ct. 1278, 1302, 36 L.Ed.2d 16 (1973).

10. Section 9411.213, D.P.W.—Pa. Manual.