D._____ R._____, on behalf of herself and all other persons similarly situated, Plaintiff,

v.

Anthony MITCHELL, Individually and in his capacity as Director of the Department of Social Services of the State of Utah, Scott M. Matheson, Individually and in his capacity as Governor of the State of Utah, Robert B. Hansen, Individually and in his capacity as Attorney General of the State of Utah, and Rob Muilenburg, Individually and in his capacity as the Administrator of the University of Utah Medical Center, Defendants.

No. 77–0156.

United States District Court,
D. Utah, C. D.

June 30, 1978.

David S. Dolowitz, of Parsons, Behle & Latimer, Salt Lake City, Utah, for plaintiff.

Robert B. Hansen, Atty. Gen., Paul M. Tinker, Asst. Atty. Gen., Salt Lake City, Utah, for defendants.

## MEMORANDUM OPINION AND ORDER

ALDON J. ANDERSON, Chief Judge.

The narrow issue presently before the court is whether the State of Utah may lawfully limit the funding of abortions provided to Medicaid recipients to those cases where the life of the mother would be endangered if an abortion is not performed.

The undisputed facts of this case show that at the time the abortion giving rise to this action was sought, plaintiff was a nineteen year old unmarried female and the mother of one child. Plaintiff is a recipient of Aid to Families with Dependent Children program (AFDC), 42 U.S.C. §§ 601 et seq., a welfare program established by the Social Security Act of 1935 and jointly administered by the United States and the State of Utah. As part of her AFDC assistance, plaintiff receives medical care under Title XIX of the Social Security Act, commonly known as the Medicaid program, 42 U.S.C. §§ 1396a et seq. (1970).

After she became pregnant, plaintiff consulted with and was examined by her physician, and determined that her desire to secure an abortion was appropriate medical treatment for her condition in the best medical judgment of her physician. Plaintiff's physician attempted to have plaintiff admitted to the University of Utah Medical Center for an abortion, but plaintiff was denied admission for treatment at the Medical Center on the ground that the Center would not be paid for the services rendered to plaintiff in light of certain provisions that had recently been enacted by the Utah State Legislature. Those provisions, House Bill 447 and a portion of Item 175 of House Bill 462, are the subject of this lawsuit and provide respectively:

> The [Utah State Department of Social Services] shall not provide any public assistance for medical, hospital or other medical expenditures or medical services to otherwise eligible persons where the purpose of such assistance is for the performance of an abortion, *unless the life of the mother would be endangered if an abortion is not performed.*

> It is the intent of the Legislature to concur in the Hyde Amendment passed by Congress to the effect that none of the funds contained in this Act shall be used to perform abortions except where the life of the mother or health of the fetus would be endangered if the fetus were carried to full term or in cases of rape and incest. This statement will hold unless overturned by the United States Supreme Court. If H.B. 447 should pass and become law this intent statement is to be deleted.

(Emphasis added). Since House Bill 447 did pass and become law, the legislative intent provision was deleted from the codification of House Bill 447. The codification of House Bill 447, *Utah Code Ann.* § 55–15a–3 (1953), reads identically to the first above-quoted paragraph. By this action, plaintiff seeks injunctive and declaratory relief from these provisions pursuant to 42 U.S.C. § 1983 (1970) and 28 U.S.C. §§ 1331, 1343, 2201 and 2202 (1970).

At the time this action was filed, the United States Supreme Court had pending before it the cases of *Beal v. Doe*, 432 U.S. 438, 97 S.Ct. 2366, 53 L.Ed.2d 464 (1977), *Maher v. Roe*, 97 S.Ct. 2376, 53 L.Ed.2d 484, 432 U.S. 464 (1977), and *Poelker v. Doe*, 432 U.S. 519, 97 S.Ct. 2391, 53 L.Ed.2d 528 (1977). The concern of these cases was various state limitations upon the funding of elective, nontherapeutic abortions in the Medicaid context. Because the major abortion decisions of the Supreme Court and the various lower court decisions from which appeal was taken in the above cases were in favor of those seeking abortions and against those attempting to restrict abortions, the defendants in this action entered into a stipulation whereby the defendants were enjoined and prohibited from enforcing the above state provisions during the pendency of this litigation, until the Supreme Court rendered its decisions in the above named cases or until further order of this court. On June 20, 1977, the Supreme Court issued its opinions in *Beal, Maher* and

*Poelker*, reversing the lower courts and remanding the causes for further action. In *Maher* the Court dealt with the constitutional questions presented by the state restrictions, and in *Beal* the Court addressed the statutory issues under the Medicaid Act. Thereafter, the present defendants filed a motion to vacate the restraining order entered against them on the basis of the stipulation and a motion to dismiss the present action with prejudice. The grounds stated in support of the motion are that the decisions of the Court in *Beal, Maher* and *Poelker* are "substantially dispositive of the issues raised in this action" and require the entry of judgment in defendants' favor. Similarly, plaintiff filed a motion for summary judgment in her favor, basing the motion on the pleadings and memoranda on file herein.

On September 13 and September 30, 1977, the court heard arguments on the above motions, and on the latter date the restraining order was vacated. In effect, this permitted defendants to enforce the challenged state provisions. The court observed in its vacating order that although the recent Supreme Court decisions did not decide the precise issue before this court, they "clearly shifted support to a position more favorable to defendants." *Order Vacating Temporary Restraining Order*, filed October 14, 1977 at 2. The issues raised by the motions to dismiss and for summary judgment were taken under advisement by the court. Subsequently, plaintiff filed a motion to modify the court's order vacating the restraining order by taking into consideration the recently enacted Labor-HEW Appropriations Act of 1978 requiring the funding not only of abortions where a pregnancy or childbirth would endanger the life of the mother, but also abortions desired where the pregnancy is the result of rape or incest or where the pregnancy would result in severe and long-lasting physical damage to the health of the mother. Arguments on this motion were had before the court and the matter again was taken under advisement. Since the matter was last argued and up through May 31, 1978, counsel for the parties have filed supplemental memoranda and correspondence with the court regarding the issues under advisement.

The positions of the parties may be stated as follows. Plaintiff contends that even though states participating in the Medicaid program are not obliged to provide funding for elective or nontherapeutic abortions (as the Supreme Court made clear in *Beal* and *Maher*), the states are required by the Medicaid statutes and regulations and the Constitution of the United States to supply such funding where a Medicaid recipient and her physician determine that an abortion is "medically necessary." Because plaintiff's abortion was "medically indicated" and thus felt to be "medically necessary," plaintiff claims that the State of Utah's refusal to provide funding of the abortion deprived her of: (1) the equal protection of the law guaranteed by the Fourteenth Amendment to the Constitution of the United States; (2) due process of law guaranteed by the Fourteenth Amendment to the Constitution; and (3) a benefit to which she was statutorily entitled under the Medicaid statutes and regulations. Defendants argue, however, that neither the Medicaid provisions nor the Constitution requires states to provide funding for medically indicated or necessary abortions. Defendants strongly urge that states may decide for themselves the extent to which they will provide funding for abortions, and that since plaintiff's abortion was sought and obtained for reasons other than that plaintiff's life would be endangered by continuing with her pregnancy, the State of Utah was and is under no obligation to bear the cost of plaintiff's abortion. Having fully and carefully considered the matters presented by the motions of the parties, the court is prepared to enter its ruling.

### The Constitutionality of Utah's Abortion Funding Statute

Plaintiff attacks Utah's abortion restrictions on both due process and equal protection grounds. With regard to the claim of violation of due process rights, plaintiff argues that the Utah provisions are constitutionally infirm "in that they prohibit pay-

ment for medically necessary abortions, thus effectuating an unconstitutional infringement upon the exercise of a constitutionally protected fundamental right." *Plaintiff's Memorandum in Opposition to Motion to Dismiss* at 5. As to the equal protection claim, plaintiff contends that the State of Utah discriminates between therapeutic and nontherapeutic abortions and the "[e]xclusion of payment for therapeutic abortions [is] an impermissible limitation upon the exercise of a constitutionally protected right." *Id.* at 6. In plaintiff's complaint it was alleged that the claimed constitutional right of plaintiff could not be infringed unless in protection of a compelling state interest. *Complaint* ¶¶ 15 and 17. In her recent memoranda, however, plaintiff makes no more mention of the necessity of such a compelling state interest, but she does continue to refer to a fundamental constitutional right to which she is entitled. Because of the overtones and the ambiguity in the language of plaintiff's documents, and the significance of the language as it pertains to the proper constitutional analysis to be applied by the court, it is necessary to discuss the nature of the right claimed by plaintiff and the extent to which the state may permissibly "interfere" with that right. For if in fact a fundamental right or interest is involved, then for both due process and equal protection purposes, the state must have a compelling interest in order to justify any abridgment of the right. *See Maher v. Roe, supra; Roe v. Wade*, 410 U.S. 113, 93 S.Ct. 705, 35 L.Ed.2d 147 (1973).

In the landmark case of *Roe v. Wade*, 410 U.S. 113, 93 S.Ct. 705, 35 L.Ed.2d 147 (1973), the United States Supreme Court recognized that there exists a "fundamental" right of privacy, and that "[t]his right of privacy . . . is broad enough to encompass a woman's decision whether or not to terminate her pregnancy." 410 U.S. at 153, 93 S.Ct. at 727. However, because of the Court's wide ranging discussion of the derivation of this unique right of privacy and of the manner in which the right to choose an abortion fits within the framework of established constitutional principles, disparate viewpoints have been ex-

pressed as to the exact status of and the dignity to be accorded to the resulting ability of a woman to choose legally an abortion. Several lower federal courts expanded the newly recognized "right to an abortion" by reading *Roe v. Wade* and subsequent Supreme Court decisions as establishing a fundamental right to abortion. *See, e. g., Roe v. Norton*, 408 F.Supp. 660 (D.Conn.1975), *rev'd, Maher v. Roe*, 432 U.S. 464, 97 S.Ct. 2376 (1977).

In *Maher v. Roe*, the Court squarely addressed the issues surrounding the constitutional status of the so-called right to abortion. The district court in *Maher* was among those courts that had concluded that *Roe v. Wade* had established a fundamental constitutional right to abortion. After stating that the "central question" in *Maher* was whether the challenged state regulation impinged upon a fundamental right protected by the Constitution, the Supreme Court concluded that "the District Court misconceived the nature and scope of the fundamental right recognized in *Roe*." 432 U.S. at 471, 97 S.Ct. at 2381. The Court thereupon recited the factual setting and its rationale and ruling in *Roe*, and stated that, "*Roe did not declare an unqualified 'constitutional right to an abortion,*' as the District Court seemed to think." *Id.* at 473, 97 S.Ct. at 2382 (emphasis added).

The *Maher* Court emphasized that, "the right in *Roe v. Wade* can be understood only by considering both the woman's interest and the nature of the State's interference with it." *Id.* Rather than giving a woman an unqualified constitutional right to an abortion, "the right protects the woman from *unduly burdensome interference* with her freedom to decide whether to terminate her pregnancy." *Id.* at 473–74, 97 S.Ct. at 2382 (emphasis added). The Court concluded that because the state in *Maher* placed "no obstacles—absolute or otherwise—in the pregnant woman's path to an abortion," the state did not have to show a compelling interest to uphold the challenged regulation. *Id.* at 474, 97 S.Ct. at 2382. Although for some the *Maher* decision may raise more questions than it an-

swers regarding proper Fourteenth Amendment analysis, it makes one point perfectly clear: *in the context of state funding of abortions,* the right recognized in *Roe v. Wade* does not require the strict scrutiny that ordinarily would be triggered by the presence of a fundamental right within the scope of traditional Fourteenth Amendment analysis.

The question remains, however, whether the situation presented in the instant case involves a suspect classification that, under Fourteenth Amendment Equal Protection analysis, would require this court to employ a strict scrutiny standard in evaluating the challenged Utah provisions. *See, e. g., San Antonio School Dist. v. Rodriguez,* 411 U.S. 1, 17, 93 S.Ct. 1278, 36 L.Ed.2d 16 (1973). Plaintiff contends that the Utah scheme creates impermissible wealth-based classifications in the ability to obtain abortions. In *Maher,* however, the Supreme Court observed that it "has never held that financial need alone identifies a suspect class for purposes of equal protection analysis," and concluded that *Maher* involved "no discrimination against a suspect class." 432 U.S. at 470–71, 97 S.Ct. at 2381. Clearly, the Court's findings in *Maher* with respect to the nature and status of the right and classification in question are dispositive of the issues in this regard presented here. Therefore, this court will proceed to determine whether Utah's statute restricting the funding of Medicaid abortions "can be sustained under the less demanding test of rationality that applies in the absence of a suspect classification or the impingement of a fundamental right." *Id.* at 478, 97 S.Ct. at 2385.

In *Maher v. Roe,* the issue before the Court was "whether the Constitution requires a participating State to pay for nontherapeutic abortions when it pays for childbirth." 432 U.S. at 466, 97 S.Ct. at 2378. The Connecticut regulation in question limited Medicaid benefits for first trimester abortions to those that were found to be "medically necessary." The term "medically necessary" was defined in the regulation to include "psychiatric necessity." *Id.,* at 466 note 2, 97 S.Ct. 2376. Al-

though the lower court had "found no independent constitutional right to a state-financed abortion," (432 U.S. at 468, 97 S.Ct. at 2379) the court held that the Connecticut program impermissibly weighted the choice of the pregnant woman against choosing to exercise her constitutionally protected right to an abortion without adequately justifying the resulting impingement. *Roe v. Norton,* 408 F.Supp. 660, 663 (D.Conn.1975). On appeal, however, the Supreme Court disagreed. The Court examined the nature of the state's interference with the indigent woman's abortion decision and concluded that Connecticut had neither placed any obstacles in the woman's path to an abortion nor otherwise interfered in an "unduly burdensome" manner with the woman's right to terminate her pregnancy. Significantly, the Court recognized, "the authority of a State to make a value judgment favoring childbirth over abortion, and to implement that judgment by the allocation of public funds," and stated that, "[t]here is a basic difference between direct state interference with a protected activity and state encouragement of an alternative activity consonant with legislative policy." 432 U.S. at 474–75, 97 S.Ct. at 2382–83. Upon finding that Connecticut need show only a reasonable basis rather than a compelling interest to validate its funding program, the Court held that the state's legitimate, strong and recognized interests in protecting the potential life of the fetus and in encouraging normal childbirth exceeded the Court's minimal level of scrutiny. *Id.* at 478–79, 97 S.Ct. 2376.

As she must, plaintiff accepts the decision in *Maher,* but argues that a state cannot further restrict the funding of abortions only to those that are necessary to save the life of the mother. Stated in the affirmative, plaintiff contends that the Constitution requires states participating in the Medicaid program to fund those abortions deemed to be "medically necessary" by the pregnant woman's attending physician. Plaintiff argues that *Maher,* "did not deal with medically necessary abortions. A statutory prohibition on a medically necessary

procedure is constitutionally impermissible." *Plaintiff's Memorandum in Opposition to Motion to Dismiss* at 5. Similarly, plaintiff asserts that, "discrimination against therapeutic abortions is not constitutionally permissible." *Id.* The acceptance of plaintiff's position, of course, would necessitate the funding of many abortions that would not be paid for if Utah's life-endangering standard were to be given effect, assuming that plaintiff's definition of "medically necessary" is adopted. This definition is taken from the companion case to *Roe v. Wade, Doe v. Bolton,* 410 U.S. 179, 93 S.Ct. 739, 35 L.Ed.2d 201 (1973), and would allow the physician to make the determination of medical necessity "in the light of all factors—physical, emotional, psychological, familial, and the woman's age—relevant to the well-being of the patient." 410 U.S. at 192, 93 S.Ct. at 747.

This court rejects plaintiff's contentions for two reasons. First, in her argument plaintiff has misstated the issue presently under discussion. The above quote from plaintiff's memorandum refers to a "statutory prohibition" on a medically necessary procedure. The crucial and simple fact remains, however, that Utah has placed no "statutory prohibition" on such a procedure—Utah has merely chosen *to fund* certain procedures and *not to fund* other procedures. Using the language of the Supreme Court in *Maher*:

> [Utah] places no obstacles—absolute or otherwise—in the pregnant woman's path to an abortion. An indigent woman who desires an abortion suffers no disadvantage as a consequence of [Utah's] decision to fund childbirth; she continues as before to be dependent on private sources for the service she desires. The State may have made childbirth a more attractive alternative, thereby influencing the woman's decision, but it has imposed no restriction on access to abortions that was not already there. The indigency that may make it difficult—and in some cases, perhaps, impossible—for some women to have abortions is neither created nor in any way affected by the [Utah statute].

432 U.S. at 474, 97 S.Ct. at 2382.

As one commentator has observed:

> The economic limitations upon the procedure of abortion, where they truly exist, are not created by government, but rather by private physicians [and facilities] who demand fee guarantees prior to the surgery. . . . To argue that, when a private physician [or facilities] demands payment in advance from his patient, a state which does not meet his [or their] demand is using programs "to limit abortions" or to "unlawfully impinge" upon the patient's rights, is to ignore both reality and stare decisis.

*Hardy, Privacy and Public Funding: Maher v. Roe as the Interaction of Roe v. Wade and Dandridge v. Williams,* 18 *Ariz.L.Rev.* 903, 911–12 (1976) (footnotes omitted) (hereinafter cited as "Privacy and Public Funding").

It seems apparent to the court that by her "statutory prohibition" argument plaintiff is injecting issues into this matter that have already been authoritatively resolved by the Court in *Maher.* The reference by plaintiff to the Court's language in *Singleton v. Wulff,* 428 U.S. 106, 117, 96 S.Ct. 2868, 2875, 49 L.Ed.2d 826 (1976), stating that, "an impecunious woman cannot easily secure an abortion without the physician's being paid by the State," and that the exercise of such a woman's right "whatever its dimension, is therefore necessarily at stake here," is of no avail here. The quote is the language of only four members of the Court, and the Court in *Maher* specifically noted that the opinion in *Singleton* was expressly limited to " 'issues of [standing] not going to the merits of this dispute.' " 432 U.S. 464 at note 10, 97 S.Ct. at 2384, *quoting Singleton v. Wulff,* 428 U.S. 106, 108, 96 S.Ct. 2868, 49 L.Ed.2d 826 (1976).

■ The Supreme Court observed it was "not unsympathetic to the plight of an indigent woman who desires an abortion . . ." but, as the Court noted, " 'the Constitution does not provide judicial remedies for every social and economic ill'." 432 U.S. at 479, 97 S.Ct. at 2385, *quoting Lindsey v. Normet,* 405 U.S. 56, 74, 92 S.Ct. 862, 31 L.Ed.2d 36

(1972). States have wide latitude in the disbursement of their limited funds, and this court cannot compel the State of Utah to provide payment for an indigent woman's exercise of her right to terminate her pregnancy when Utah has chosen by deliberate legislative processes not to do so. Persons in this country have many rights which they may exercise freely in the sense that a government cannot prohibit the exercise of the respective rights. This does not mean, however, that the government has a corresponding duty *to fund* the exercise of that right. Likewise, the state's refusal to pay for the exercise of the right does not limit, penalize or prohibit the exercise of that right in the constitutional sense. *See Maher v. Roe, supra,* at notes 8 and 9; *Privacy and Public Funding* at 906–12. It is the opinion of this court that the failure to distinguish these concepts would make the Constitution "a mandate for governmental interference, rather than a bulwark against it." *Privacy and Public Funding* at 907.

Second, plaintiff has provided no meaningful authority or reasoning to the court other than her bald assertion that the Utah provisions are unconstitutional. There is no reason why the principle articulated in *Maher* should not control the disposition of the constitutional issues in this case. The key concept set forth in *Maher* is that there is a basic difference between state interference with a protected activity and state encouragement of an alternative activity. Even though fewer abortions might be funded under Utah's statute, such a result would be constitutionally insignificant. If the State of Utah, under *Maher,* may make a choice favoring childbirth over abortion and implement that decision through the allocation of public funds, it may do so on any reasonable conditions. Given the state's strong interests in protecting the potential life of the fetus, encouraging normal childbirth and appropriately using state funds (see discussion of the state's interests, *infra* ), the life-endangering standard of *Utah Code Ann.* § 55–15a–3 (1953) is entirely reasonable. By so restricting its underwriting of abortions the State of Utah has

placed no obstacle in the path of a woman seeking an abortion, and it has not directly or otherwise interfered in an unduly burdensome fashion with the exercise of the woman's right. Furthermore, the discrimination—if indeed it can be labeled as such—resulting from the state's preference of childbirth over abortion is clearly justified by the above-mentioned interests of the state. The state's interests are furthered by and are rationally and reasonably related to Utah's funding provisions, and, thus, the disparate treatment of childbirth and abortion is constitutionally permissible. *Accord, Woe v. Califano,* Order Granting Defendant's Motion for Summary Judgment, Civil No. C–2–76–755 (S.D.Ohio, Eastern Div., Judge Duncan, filed January 9, 1978).

Additional support for the court's conclusion can be found in one of the companion cases to *Maher, Poelker v. Doe,* 432 U.S. 519, 97 S.Ct. 2376, 53 L.Ed.2d 484 (1977). The plaintiff in *Poelker* challenged on constitutional· grounds a policy and practice followed by two city-owned hospitals in St. Louis, Missouri, that prohibited the performance of abortions in the hospitals unless "there was a threat of grave physiological injury or death to the mother." 432 U.S. at 520, 97 S.Ct. at 2392. Although this standard is not as restrictive as that codified by Utah, it obviously is much more restrictive than the "medically necessary" standard advocated by plaintiff, which plaintiff claims is constitutionally mandated and which takes into consideration such items as psychological, emotional and familial factors. Also, the policy may have had a much greater impact on the ability to obtain abortions by women generally, since *no abortions* could be performed in the hospitals unless the above conditions were met. Nevertheless, in a *per curiam* opinion, the Court reversed the lower court decision that had held the hospitals' policy to be unconstitutional. The Court stated that "the constitutional question presented here is identical in principle with that presented by a State's refusal to provide Medicaid benefits for abortions while providing them for child-

birth." 432 U.S. at 521, 97 S.Ct. at 2392. The Court went on to "hold, for the reasons stated in *Maher*, the Constitution does not forbid a State or city, pursuant to democratic processes, from expressing a preference for normal childbirth as St. Louis has done." *Id.*

Plaintiff cites language from *Maher* and *New Jersey Welfare Rights Organization v. Cahill*, 411 U.S. 619, 93 S.Ct. 1700, 36 L.Ed.2d 543 (1973), to the effect that a state has no constitutional obligation to pay the pregnancy-related expenses of an indigent woman, but once it chooses to do so, "the manner in which it dispenses benefits is subject to constitutional limitations." 432 U.S. at 469–70, 97 S.Ct. at 2380. The import of this is obvious. The ruling of this court and the Supreme Court in *Maher* should in no way imply that Utah's participation in the Medicaid program is beyond the reach of the operation of the Constitution. What the court does hold is that the Utah abortion funding provisions are consonant with and safely within the bounds of the pertinent constitutional limitations.

### The Consistency of Utah's Abortion Funding Statute with Title XIX

The thrust of plaintiff's second attack upon Utah's limited abortion funding provisions is the alleged statutory shortcoming of the program. The Public Assistance Chapter of the Utah Code requires the State of Utah and the Utah Department of Social Services to administer its jointly funded assistance programs in conformity with the federal assistance statutes and regulations. In particular, *Utah Code Ann.* § 55–15a–14 (1953) gives the director of the Department of Social Services authority to bind the state "to any executive or legislative provisions promulgated or enacted by the federal government which invites the state to participate in the distribution, disbursement or administration of any . . . money for the benefit and welfare of recipients of public assistance and other low income residents." Further, § 55–15a–14 requires that the state ". . . shall comply with all requirements of the Social Security Act and all orders, rules and regulations promulgated thereunder *when required as a condition of participation in benefits under the Social Security Act.*" (Emphasis added). Inasmuch as Medicaid was enacted in 1965 as Title XIX of the Social Security Act, these statutory directives apply to Utah's disbursements under the Medicaid program. The provisions of § 55–15a–14, however, merely state truisms of federal constitutional law and serve only to frame the question that this court now faces: to wit, what category of abortions, if any, must a state fund as a condition of participation in the federal Medicaid program? Once the answer to this question is ascertained, the action required on the part of the State of Utah will be readily apparent.

Plaintiff strenuously argues that the federal Medicaid "statutes and regulations require the defendants to make payment for abortions based solely on regular Medicaid criteria: to-wit, eligibility and the determination of reasonable medical necessity for the treatment prescribed." *Complaint* ¶ 20. According to plaintiff, the restrictions on abortion funding enacted by the Utah Legislature are contrary to the Medicaid requirements as interpreted by the Supreme Court in *Beal v. Doe*, in that they do not allow the funding of therapeutic or "medically necessary" abortions, but rather permit the funding only of abortions that meet the life-endangering standard of the Utah statute. Again, plaintiff contends for definition of "medically necessary" that would include all of the factors listed in *Doe v. Bolton*, 410 U.S. 179, 192, 93 S.Ct. 739, 35 L.Ed.2d 201 (1973). Plaintiff also argues that even if this court ruled Title XIX does not require the funding of all "medically necessary" abortions, it must order at least the funding of abortions under the recent Labor-HEW Appropriations Act of 1978. This Act allows the expenditure of federal funds for abortions "where the life of the mother would be endangered if the fetus were carried to term," where there are cases of properly reported rape or incest, and "where severe and long lasting physical health damage to the mother would result

if the pregnancy were carried to term when so determined by two physicians."

Defendants counter plaintiff's contentions by arguing just as fervently that a state has broad discretion under the Medicaid program to determine what procedures it will fund and to what extent those procedures will be funded, so long as the standards set by the state are reasonable. And, it is asserted, Utah's Legislature has exercised its discretion in setting the standard for the funding of abortions and plaintiff has not shown that these standards are unreasonable. Defendants not only feel that the Court in *Beal* did not hold that states *must* fund all "medically necessary" abortions, but they apparently claim that *Beal* held that states do not have to fund any class of abortions at all. Accordingly, defendants conclude that Utah's policy is not inconsistent with any federal provisions and thus no questions of federal supremacy are raised.

Title XIX of the Social Security Act establishes a Medical Assistance Program pursuant to which the states *may* provide federally-funded medical aid to the "categorically" and "medically" needy. The statute makes no specific reference to abortions or, for that matter, to any other particular medical procedure. Instead the Act mentions general categories of service which must be made available. As a prerequisite to federal funding under Title XIX, a state Medicaid plan must provide financial assistance to the categorically needy with regard to five general categories of medical treatment: (1) inpatient hospital services; (2) outpatient hospital services; (3) other laboratory and X-ray services; (4) skilled nursing facility services, periodic screening and diagnosis of children, and family planning services; and (5) physician's services. 42 U.S.C. §§ 1396a(a)(13)(B) and 1396d(a)(1)–(5) (1970). Under the program, a state pays for medical assistance rendered pursuant to its Medicaid plan, and is then reimbursed by the federal government in accordance with a statutory formula for that percentage of the payment that the federal government is obligated to pay for the services rendered.

Nothing in the statute requires or even suggests that states participating in the Medicaid program must fund every procedure that falls within the delineated categories of medical care, and it is clear that states do have considerable latitude in choosing the procedures which they will fund and the extent to which such procedures will be funded. Title XIX expressly provides:

"A State plan for medical assistance must . . . include reasonable standards . . . for determining eligibility for and the extent of medical assistance under the plan which . . . are consistent with the objectives of this [Act] . . . ."

42 U.S.C. § 1396a(a)(17) (1970 ed., Supp. V). The discretion of the states is bounded by the two criteria contained in this provision. That is, any standards adopted by a state must be reasonable and cannot be inconsistent with the objectives of Title XIX. *See Beal v. Doe*, 432 U.S. 438, 444, 97 S.Ct. 2366, 53 L.Ed.2d 464 (1977). Also, the statute requires that medical assistance be equitably distributed among the beneficiaries of the Medicaid program. 42 U.S.C. § 1396a(a)(10) (1970 ed., Supp. V). The pertinent regulation promulgated pursuant to Title XIX provides that a ". . . State may not arbitrarily deny or reduce the amount, duration, or scope of, such services to an otherwise eligible individual solely because of the diagnosis, type of illness or condition." 45 C.F.R. § 249.-10(a)(5)(i) (1976). This same regulatory provision makes it clear, however, that, "*[a]ppropriate limits may be placed on services* based on such criteria as medical necessity or those contained in utilization or medical review procedures." *Id.* (emphasis added).

These statutory and regulatory provisions lead inescapably to two basic conclusions. First, the participating state may select those procedures which it will fund under the Medicaid program and may determine the extent to which those procedures will be funded, placing "appropriate limits" on the

services offered. Second, the discretion of the participating state is limited only by three factors: (1) the plan or standard adopted by a state must be reasonable; (2) Medicaid funds must be distributed equally and equitably among Medicaid recipients; and (3) the plan or standard must be consistent with the objectives of Title XIX. Applying these concepts to the present case, the issue that this court must resolve may be stated with a simplicity that belies the complexities and subtleties of this case: to wit, is the life-endangering abortion funding standard enacted by the Utah Legislature reasonable, equitable and consistent with the objectives of the Medicaid Act?

The authority that largely provides the answer to the instant question is the decision of the Supreme Court in *Beal v. Doe*, 432 U.S. 438, 97 S.Ct. 2366, 53 L.Ed.2d 464 (1977). The state provisions challenged in *Beal*, like those in *Maher*, limited Medicaid assistance to those abortions that were found to be "medically necessary." The Court stated that the "only question before" it—one of statutory construction— was "whether Title XIX requires Pennsylvania to fund under its Medicaid program the cost of *all* abortions that are permissible under state law." 432 U.S. at 443–44, 97 S.Ct. at 2370–71 (emphasis in original). After analyzing the structure and requirements of Title XIX and weighing the interests of Pennsylvania in so limiting the funding of abortions, the Court held that the challenged state statute was compatible with Title XIX. *Id.* at 447, 97 S.Ct. 2366. Also, like *Maher, Beal* obviously did not decide the precise issue that is raised by the present lawsuit, since Utah further restricts the funding of abortions to those where "the life of the mother would be endangered if an abortion is not performed." *Utah Code Ann.* § 55–15a–3 (1953). With *Beal* as a guide, this court will now address the issues raised by the Utah provision.

With regard to the Title XIX requirements of reasonableness and equality, the court feels that *Beal* is controlling and compels a conclusion in favor of defendants. Indeed, plaintiff does not make an effective argument to the contrary. The plaintiffs in

*Beal* asserted that the exclusion of nontherapeutic abortions from Medicaid coverage was unreasonable on both economic and health grounds. 432 U.S. at 445, 97 S.Ct. 2366. The economic argument was grounded on the view that since a pregnant Medicaid recipient is confronted with two alternatives, abortion or childbirth, and since abortion is generally a less expensive medical procedure than childbirth, a state that chooses not to fund nontherapeutic abortions will be faced with the greater expenses of childbirth. The health argument was "based on the view that an early abortion poses less of a risk to the woman's health than childbirth." *Id.* Although the Supreme Court provided no direct response to these contentions, it held that a state has a "valid and important" and an "unquestionably strong and legitimate" interest in encouraging normal childbirth, "throughout the course of a woman's pregnancy." *Id.* at 445–46, 97 S.Ct. at 2372. Because the plaintiffs had not made a *specific showing* in either the language or the legislative history of Title XIX that suggested that Pennsylvania's program was unreasonable, the Court would "not presume that Congress intended to condition a State's participation in the Medicaid program on its willingness to undercut this important interest by subsidizing the costs of nontherapeutic abortions." *Id.* at 446, 97 S.Ct. at 2372.

Defendants in this matter name two basic interests that Utah has in enforcing House Bill 447 and Item 175 of House Bill 462: "(1) The most appropriate use of limited Medicaid funds; and (2) Encouraging normal childbirth over abortion." *Defendant's Memorandum in Support of Motion to Vacate Temporary Restraining Order and to Dismiss* at 5. The economic interest advanced by Utah has been urged by other states and has generally been held to be unpersuasive because of the rebutting argument that abortions are generally less expensive than childbirth. *E. g., Roe v. Norton*, 408 F.Supp. 660, 664 (D.Conn.1975). As indicated above, the *Beal* Court did not directly respond to this argument, but concluded that other interests of the state dic-

tated the result reached by the court. This court is constrained to note, however, that this rebutting argument is not necessarily the last word on the validity of the economic interest of states in limiting the funding of abortions while providing full funding for childbirth. There are reputable data and sound arguments available that may compel the recognition of this important state interest. For example, one commentator concludes:

On a case-by-case level of analysis, this argument carries much weight. Abortions do, as a general rule, consume a lesser amount of medical resources than do deliveries. When viewed at the systems level, a different result may be obtained. The cost of a systematic provision of free abortion may be considerably higher than the cost of a system of free delivery, due to a tendency of low cost abortion to encourage reliance on abortion as a contraceptive, and due to long term complications on future deliveries.

*Privacy and Public Funding* at 926–27. See *Id.* at 926–30 for a detailed discussion in this vein.

The interest of the State of Utah in encouraging normal childbirth creates a powerful presumption that Utah's funding scheme is reasonable. As the Court noted in *Beal*, the Court has long acknowledged that a "State has a valid and important interest in encouraging childbirth." 432 U.S. at 445, 97 S.Ct. at 2372. A state's interests in this regard are twofold: the state has a direct interest in protecting the fetus, and a legitimate interest regarding its rate of population growth. *Maher v. Roe*, 432 U.S. 464, 478 note 11, 97 S.Ct. 2376, 2385, 53 L.Ed.2d 484 (1977). "Such concerns are basic to the future of the state and in some circumstances could constitute a substantial reason for departure from a position of neutrality between abortion and childbirth." *Id.* After characterizing this interest as "unquestionably strong and legitimate," the Court concluded that those seeking to challenge restrictive provisions such as those in question here must make a showing of unreasonableness in order to overcome this important interest. *Id.* at

446, 97 S.Ct. 2366. Again, plaintiff has not made such a showing here and, as in the constitutional analysis above, this court sees no basis for distinguishing *Beal* and concluding that the state's interests should not control here despite the more restrictive effect of the Utah statute.

This court also reaches a similar conclusion with respect to the equality requirement of Title XIX. The court sees no legally significant difference in the alleged disparate treatment in the disbursement of funds upheld in *Beal* and the disparate treatment alleged here. Indeed, the fact that the *Beal* Court did not even deal with the equality requirement causes one to wonder if the provision is a serious requirement at all. Also, the Court has indicated that disparate treatment in pregnancy related procedures may presumptively be more justified than such treatment in other medical procedures. In *Maher* the Court stated in response to such an allegation that, "[t]he simple answer to the argument that similar requirements are not imposed for other medical procedures is that *such procedures do not involve the termination of a potential human life.*" 432 U.S. at 480, 97 S.Ct. at 2386 (emphasis added).

Although the reasonableness and equality requirements of Title XIX are easily satisfied by Utah's funding statute, the question remains whether the state provisions are consistent with the objective of Title XIX. Plaintiff adamantly contends that the Medicaid Act and the *Beal* Court's construction of the statute require that a participating state fund all those abortions which the attending physician of a Medicaid recipient deem to be "medically necessary." Basing her argument upon certain statutory language and various dicta and footnotes of the Court in *Beal*, plaintiff claims that, "the United States Supreme Court ruled that a State Medicaid Plan . . . must require payment for medically necessary abortions." *Plaintiffs' Memorandum in Opposition to Motion to Dismiss* at 4. It is manifest, however, that the Court did not rule as plaintiff contends it did. The Court explicitly stated that "serious statutory

questions *might* be presented if a state Medicaid plan excluded necessary medical treatment from its coverage . . . ." 432 U.S. at 444, 97 S.Ct. at 2371 (emphasis added). Clearly, such questions were not directly addressed or resolved by the Court. Thus, the instant question is an open one which this court must answer for itself in light of all relevant facts and legal principles.

In *Beal*, the Supreme Court identified the "broadly stated primary objective" of Title XIX as the Act's enabling "each State, as far as practicable under the conditions in such State, to furnish . . . medical assistance on behalf of [properly qualified recipients] whose income and resources are insufficient to meet the costs of necessary medical services." 42 U.S.C. § 1396 (1970); also, see *Id.* § 1396a(a)(10)(C)(i). It is this language found in the preamble to the Medicaid Act from which the term "medically necessary" is derived. Hence, in this context, the crucial question before the court is whether Utah's life-endangering abortion funding standard is inconsistent with the broadly stated objective of Title XIX to provide "necessary medical services" to qualified individuals. Obviously, the resolution of this question requires the ascertainment of the meaning of the term "necessary medical services."

The term "necessary medical services" has been said to have at least three possible meanings: (1) that intended by Congress at the time Title XIX was enacted; (2) that referred to in the medical community; or (3) that required by constitutional analysis; see *Butler, The Right to Medicaid Payment for Abortion*, 28 *Hastings L.J.* 931, 954 (1977) (hereinafter cited as "Medicaid Payment for Abortion"). First, "[t]he starting point in every case involving construction of a statute is the language itself." *Blue Chip Stamps v. Manor Drug Stores*, 421 U.S. 723, 756, 95 S.Ct. 1917, 1935, 44 L.Ed.2d 539 (1975) (Powell, J., concurring). Unfortunately, however, the Medicaid Act contains no definition of the term "necessary medical services" or "medically necessary." Moreover, in 1967 Congress amended the statute to include an express requirement that states implement systems to control the use of "unnecessary" medical services, without defining the term "unnecessary." Act of Jan. 2, 1968, Pub.L.No.90–248, § 237, 81 Stat. 911 [codified at 42 U.S.C. § 1396a(a)(30)]. Thus, the court is left without express statutory assistance. As observed above, the term is contained only in broad provisions from which no further enlightenment can be obtained whether the provisions are read independently or in conjunction with other provisions. There appears to be no reason to believe that in drafting the Medicaid Act Congress attached any special meaning to the term or that it imagined any special significance would be attached to the phrase. And as to any other identifiable legislative intent on the part of Congress, one commentator has concluded that "[c]ongressional intent in drafting the preamble to the Medicaid statute is so ambiguous as to be meaningless and does not advance analysis of the term." *Medicaid Payment for Abortion* at 954–55. Consequently, guidance as to the meaning of the term must be sought elsewhere.

The second possible meaning of "necessary medical services" is that contemplated by the medical community. This has been defined as: "[that] care which is responsive to the problem for which it is offered." *Medicaid Payment for Abortion* at 955. The application of this definition in the abortion context, for example, would proceed as follows: pregnancy is the condition and any "treatment" of the condition of pregnancy requires medical services; and since abortion is a treatment for the pregnancy, abortion is therefore a medically necessary service. It is this definition that occupied the attention of the Court in *Beal*. The position of the three dissenters in *Beal* was that Title XIX required the funding of elective abortions because, "[p]regnancy is unquestionably a condition requiring medical services," and "abortions constitute medically necessary treatment for the condition of pregnancy." 432 U.S. at 449, 97 S.Ct. at 2373. (Brennan, J., dissenting). This position was in harmony with several lower court cases which had followed essen-

tially this same line of reasoning and reached the results unavailingly urged by the *Beal* minority. *See, e. g., Doe v. Beal,* 523 F.2d 611, 618 (3d Cir. 1975), *rev'd, Beal v. Doe,* 432 U.S. 438, 97 S.Ct. 2366, 53 L.Ed.2d 464 (1977); *Roe v. Norton,* 522 F.2d 928, 937 (2d Cir. 1975); *Coe v. Hooker,* 406 F.Supp. 1072, 1081 (D.N.H.1976); *Klein v. Nassau County Medical Center,* 347 F.Supp. 496 (E.D.N.Y.1972), *vacated,* 412 U.S. 925, 93 S.Ct. 2747, 37 L.Ed.2d 151 (1973). This view, however, was repudiated and rejected by the majority of the Court in *Beal.* In response to the contention that states must fund all abortions that are permissible under state law, the Court concluded that states are free "to refuse to fund *unnecessary*—though perhaps desirable—medical services." 432 U.S. at 445, 97 S.Ct. at 2371. Clearly, in so doing, the Court declined to embrace the broad medical community meaning of the term "necessary medical services," and demonstrated that the word "necessary" was to have a much narrower meaning than that previously assigned to it.

The third suggested possible construction of the term in question is that which may be referred to as required by the Constitution. As noted earlier, in *Doe v. Bolton,* 410 U.S. 179, 93 S.Ct. 739, 35 L.Ed.2d 201 (1973), the Supreme Court indicated that whether " 'an abortion is necessary' is a professional judgment that . . . may be exercised in the light of all factors—physical, emotional, psychological, familial, and the woman's age—relevant to the well-being of the patient." 410 U.S. at 192, 93 S.Ct. at 747. Plaintiff emphasizes that this formulation was referred to in *Beal* and asserts that the only reason that the Pennsylvania program at stake in *Beal* was upheld is that the program is broad enough to encompass the factors specified in *Bolton,* and that Utah's program must fail because it is not broad enough to encompass these factors. It is true that a cursory and superficial reading of certain portions of Title XIX and the *Beal* opinion might support the conclusion urged by plaintiff. The court, indeed, is aware that two other courts have arrived at this very conclusion. *See Zbaraz v. Quern,* Memorandum Opinion and Order, Civil No.

77–C–4522 (N.D.Ill., Eastern Div., Judge Kirkland, filed May 15, 1978); *Emma G. v. Edwards,* 434 F.Supp. 1048 (D.La.1977) (dicta). But the significance of the present issue is deserving of a more thorough treatment.

This court does not believe that the list of factors in *Bolton* can be transported into Title XIX and become the standard by which the level of required abortion funding is measured. First, the footnotes in *Beal* to which plaintiff refers do not establish an inflexible funding standard. At most the references create ambiguities as to the intent or feeling of the Court in this matter. Various other passages in *Beal* may lead one to a very different conclusion (see discussion, *infra* at p. 623).

Second, as fully discussed in the constitutional analysis above, *Bolton* involved a *direct interference* with a woman's right to terminate her pregnancy. In contrast, the essence of Title XIX, of course, is *funding.* The Supreme Court has amply demonstrated in *Maher* and *Beal* that the right to an abortion acquires an entirely different hue and brings into play a wholly different set of factors in the funding context. Similarly, this court is of the opinion that the set of factors mentioned in *Bolton* is not the governing standard in the abortion funding setting. Under Utah's funding provisions, for example, the state is not proscribing the performance of abortions or intruding into the doctor-patient relationship by prohibiting the recipient's attending physician from advising his patient in accordance with his best medical judgment based on any factors deemed relevant by the physician. Rather, the state is merely setting the conditions under which it will pay for the abortions performed. To assert at this point that the present issue is distinguishable from the corresponding constitutional issue because Title XIX requires the funding of "medically necessary" abortions is to do nothing more than beg the question facing the court.

Finally, this court feels that the Supreme Court has clearly indicated that the standard of *Doe v. Bolton* has been modified in

the environment of abortion funding. A glance at the criteria set forth in *Bolton* reveals that the standard is not a great deal more restrictive than a standard that would allow mere elective abortions, and is in reality based largely on the spirit of personal choice and freedom that pervades the *Bolton* and *Wade* decisions.[1] By comparison, the concept of medical necessity given effect in *Beal* indicates that the attending physician must conclude from his consideration of all relevant factors that the factors indicate an actual effect on the woman's health. Thus, it has been observed that, "*Beal* indeed may mark a significant turn in the interpretation of the underlying *Bolton* right itself." *Privacy and Public Funding* at note 103. While this court is not saying that the so-called *Bolton* right has been diminished in a non-funding setting, it is saying that in the area of state funding of abortions under Title XIX the right and standard *indicated* in *Bolton* takes on a different and presently undefined—but certainly narrower—perspective.

Because none of the three previously suggested meanings of the term "necessary medical services" is a sound or reliable one—especially in the abortion context—it is incumbent upon this court to fashion what it believes to be an accurate and valid meaning of the term as it applies in this case. And in the absence of any intrinsic aids to construction of the term, resort must be had to extrinsic aids. The initial inquiry must be whether Title XIX *requires* participating states to fund abortions at all. (In *Beal* the Court made it clear, "that the federal statute leaves a State free to provide such coverage *if it so desires*." 432 U.S. at 447, 97 S.Ct. at 2372 (emphasis added)). The primary rule of construction relevant to this inquiry is that of contemporary circumstances. It is a settled rule of construction that "[a] statute must be construed with reference to the circumstances

existing at the time of its passage and in the light of the conditions under which Congress acted at the time." *Roe v. Norton*, 522 F.2d 928, 935 (2d Cir. 1975). Also, *see, e. g., Moor v. County of Alameda*, 411 U.S. 693, 709, 93 S.Ct. 1785, 36 L.Ed.2d 596 (1973); *United States v. Wise*, 370 U.S. 405, 411, 82 S.Ct. 1354, 8 L.Ed.2d 590 (1962); *National Citizens Committee for Broadcasting*, 555 F.2d 938, 952 (D.C.Cir.1977). This principle was employed by the Court in *Beal* when it stated:

> [W]hen Congress passed Title XIX in 1965, nontherapeutic abortions were unlawful in most States. In view of the then-prevailing state law, the contention that Congress intended to require—rather than permit—participating States to fund nontherapeutic abortions requires far more convincing proof than [plaintiffs] have offered.

432 U.S. at 447, 97 S.Ct. at 2372. Because of the general illegality of abortions at the time of enactment of Title XIX, this court believes that it is utterly untenable to suggest that the Medicaid Act as originally enacted required payment for abortions. *See also Roe v. Norton*, 522 F.2d 928, 935 (2d Cir. 1975); Note, *Medicaid and the Abortion Right*, 44 Geo.Wash.L.Rev. 405, 410–11 (1976).

In 1972, Congress amended Title XIX to include "family planning services" within the five broad categories of required medical treatment. It was argued by proponents of abortion funding and held by some courts that in light of similar enactments wherein Congress expressly excluded abortions as a method of family planning, the failure to so expressly exclude abortion in the Title XIX amendment strongly indicated an intention on the part of Congress to require Medicaid coverage of abortions. In *Beal*, however, the Court addressed this argument and concluded that: "This line of

---

1. The facts of the instant case demonstrate the proposition that the distinction between the terms therapeutic and nontherapeutic as used herein may be largely illusory. Plaintiff claims only, "that her *desire* to secure an abortion was *appropriate medical treatment* . . . in the best judgment of her physician." *Complaint*

¶ 10 (emphasis added). As defendants aptly observe, "[i]f, as plaintiff contends, all abortions which are considered 'appropriate' are 'necessary,' then there is no distinction whatsoever between a therapeutic and non-therapeutic abortion." *Defendants' Reply Memorandum* at 3. *Beal* does not allow such a result.

reasoning is flawed. The failure to exclude abortions from coverage indicates only that Congress intended *to allow* such coverage, not that such coverage is mandatory for non-therapeutic abortions." 432 U.S. 438 at note 10, 97 S.Ct. at 2372 (emphasis added). Thus, there is nothing presently in Title XIX itself that requires the funding of that category of abortions that plaintiff labels as "medically necessary," and consequently the court must look to subsequent judicial interpretations and legislative developments that have a bearing upon the statute.

In *Beal* the Court used the word "nontherapeutic" in connection with its discussion of the circumstances existing at the time Title XIX was enacted. Because the word "therapeutic" is used by plaintiff and others interchangeably with the term "medically necessary," it is essential to determine the meaning of "nontherapeutic" as that term is used by the Court. In the passages cited, the Court referred to "nontherapeutic" abortions as those that were unlawful in most states prior to its decision in *Roe v. Wade, supra*; and, specifically, to the Texas statute at issue in *Roe* and those "similar statutes" that were "in existence in a majority of the States." 410 U.S. at 118, 93 S.Ct. at 709. The only abortions lawful in Texas and a majority of the states were abortions procured or attempted by "medical advice *for the purpose of saving the life of the mother.*" *Id.* (emphasis added). Thus, reading *Roe* and *Beal* together it is evident that the Court's view is that "therapeutic" abortions under Title XIX are those necessary to, in effect, save the life of the mother, and that "nontherapeutic" abortions are those abortions that are performed for a less compelling reason. It may be argued that this concept of what constitutes a "therapeutic" abortion was outmoded by the *Wade* and *Bolton* decisions, since those cases so dramatically expanded the category of lawful abortions, and that now a "therapeutic" abortion must include any lawful abortion that would make the pregnant woman feel better. As this court has demonstrated, however (see discussion *supra* at pp. 620–621), the Court's decision in *Beal* does not support

such a conclusion. Furthermore, when the Court decided *Wade* and *Bolton* and formulated the *Bolton* concept of "medically necessary" it is extremely unlikely that it even remotely considered the possible impact of those decisions upon Title XIX, and, thus, as a rule of statutory construction, the *Bolton* standard can hardly be said to be a meaningful or reliable authority as to the meaning of the term "necessary medical services" under the federal statute.

That the Title XIX concept of therapeutic or necessary abortions must be viewed to be those abortions necessary to prevent the endangering of the life of the mother is also indicated by the highly relevant and significant action taken by Congress in enacting the Labor-HEW Appropriation Acts of 1977 and 1978. In the 1977 Act Congress prohibited the use of federal Medicaid funds for abortions except where the life of the mother would be endangered if the fetus were carried to term. Departments of Labor and Health, Education, and Welfare Appropriation Act, 1977, § 209, Pub.L. 94–439, 90 Stat. 1434 (popularly known as the Hyde Amendment). The equivalent provision for 1978 increased the range of permissible abortions to allow funding, in pertinent part, where long lasting physical health damage to the mother would result if the pregnancy were carried to term. Departments of Labor and Health, Education, and Welfare Appropriation Act, 1977, § 101, Pub.L. 95–205, 91 Stat. 1460. This congressional action bears upon the present matter in two important respects. First, it seems clear that an appropriations measure is an "act of Congress." *See Tennessee Valley Authority v. Hill*, —— U.S. ——, ——, 98 S.Ct. 2279, 57 L.Ed.2d 117 (1978). A subsequent act of Congress that relates to an earlier statutory provision can be regarded as a legislative interpretation of the earlier act and is thus entitled to considerable weight in resolving ambiguities and doubts raised regarding the meaning of the earlier act. *See, e. g., Erlenbaugh v. United States*, 409 U.S. 239, 93 S.Ct. 477, 34 L.Ed.2d 446 (1972). In a situation which seems analogous to that at hand, the United

States Court of Appeals for the Fourth Circuit stated that:

> These later [appropriation] acts of Congress should be accorded "significant weight" in determining the intent of earlier legislation. *NLRB v. Bell Aerospace Co.*, 416 U.S. 267, 275, 94 S.Ct. 1757, 40 L.Ed.2d 134 (1974). Moreover, these Appropriation Acts, in themselves, may be considered substantive amendments to the Black Lung Act. *United States v. Dickerson*, 310 U.S. 554, 555, 60 S.Ct. 1034, 84 L.Ed. 1356 (1940).

*Office of Workers' Compensation Programs, U. S. Dep't of Labor v. National Mines Corp.*, 554 F.2d 1267, 1275 (4th Cir. 1977). Thus, in the present case, the Hyde Amendment and its replacement statute are of assistance in ascertaining the meaning of "necessary medical services" in the abortion setting, and that meaning is substantially similar to that which the Supreme Court indicated was "therapeutic" in *Beal* and *Wade*. *See* 432 U.S. at 447, 97 S.Ct. 2366, and discussion *supra* at p. 623. Only recently has Congress precisely dealt with the interface between Medicaid funding and abortions and, under these circumstances, its statutory directive as to the appropriate extent of funding under Title XIX should be granted substantial weight. That Congress could have chosen the more direct route of amending Title XIX itself rather than express its position through the appropriation measures is of little countervailing significance. The practicality of such an alternative route is difficult to assess, and legislative inaction or silence in a particular direction is always a poor beacon to follow in construing statutes. *See, e. g., Zuber v. Allen*, 396 U.S. 168, 185, 90 S.Ct. 314, 24 L.Ed.2d 345 (1969). It must be noted that this case does not involve the disfavored doctrine of repeal by implication discussed in *Tennessee Valley Authority v. Hill*, —— U.S. ——, 98 S.Ct. 2279, 57 L.Ed.2d 117 (1978) or the principle that limitations on the use of funds contained in an appropriations bill do not suspend statutory obligations [*see New York Airways, Inc. v. United States*, 369 F.2d 743 (Ct. of Claims 1966)] for the simple reason that this court perceives neither a conflict between Title XIX and the Labor-HEW Appropriation Acts nor a statutory obligation created by Title XIX that the Acts seek to limit.

The second noteworthy item regarding the appropriation acts is the reference the Supreme Court made with respect to the bills. At the time the Court considered and ruled in *Beal, Maher* and *Poelker*, the Hyde Amendment was in effect. In *Beal*, after indicating that "therapeutic" abortions were those that were lawful in most states when Title XIX was enacted, the court concluded that the failure to provide coverage for "nontherapeutic" abortions is not inconsistent with Title XIX. 432 U.S. at 447, 97 S.Ct. 2366. In so doing, the Court made specific reference to the Hyde Amendment then in effect. 432 U.S. 438 at note 14, 97 S.Ct. 2366. The conclusion to be drawn from this unembellished reference may be of great import. In any event, this court infers from the above references from the Supreme Court rulings that the restrictive life-endangering standard of the Hyde Amendment under the rules of construction that apply, is the clearest indication of what category of abortions may be covered by the Medicaid Act. At least, it seems evident the Hyde Amendment was not inconsistent with the requirements of Title XIX. Either view weighs heavily in favor of the present defendants.

▮ In sum, in light of all the above available factors, it is the opinion of this court that Title XIX may not *require* the funding of any class of abortions, and, if it does require the funding of some abortions, it requires the subsidizing of only those abortions that were lawful in most states when Title XIX was enacted. In *Beal* and *Roe v. Wade*, the Court has indicated that these abortions are those necessary to prevent the endangering of the life of the mother by the carrying of the pregnancy to term. Inasmuch as *Utah Code Ann.* § 55–15a–3 (1953) is consistent with this life-en-

dangering standard,[2] it follows that the challenged Utah provisions must be upheld.

This court's construction of Title XIX and the resulting level of participation required of the states are reinforced by several other considerations. First, the Utah provisions are pursuant to and consistent with the regulation promulgated under Title XIX. The regulation expressly provides that a state may place limits on the services offered under its Medicaid plan, such limits being based on criteria *"such as "* medical necessity or utilization procedures. See 45 C.F.R. § 249.10(a)(5)(i) (1976). The term "medical necessity" must be read as relating back to the statutory term "necessary medical services" and is thus subject to the same construction that the court has given the statutory equivalent. Even if a broader meaning were to be associated with the term, the regulating provision indicates that the "medical necessity" criterion is merely illustrative of the types of criteria that may be employed to limit services, and nothing in the provision suggests a more restrictive criterion is prohibited. With respect to the requirement in the regulation that a state may not arbitrarily deny or reduce the availability of the services provided under its plan solely because of the diagnosis or type of condition, it is apparent that Utah has not denied or reduced the funding of abortions, but, in light of the great state interests involved, has only limited the funding of the service in an entirely authorized and non-arbitrary manner.

Second, the minority in *Beal* argued in its dissent from the majority opinion that,

> "[i]f Pennsylvania is not obligated to fund medical services rendered in performing elective abortions because they are not 'necessary' within the meaning of [Title XIX], it must follow that Pennsylvania also would not violate the statute if it refused to fund medical services for 'therapeutic' abortions . . . . .

432 U.S. at 451, 97 S.Ct. at 2375 (Brennan, J., dissenting). Regardless of the motive that prompted this remark, this court finds that the observation of the dissent centers on the critical issue here and is a persuasive indication of the result of carrying the reasoning of the majority to its logical conclusion.

Third, certainly a very influential factor in the court's decision is the statement of the United States Court of Appeals for the Tenth Circuit in *Doe v. Rose,* 499 F.2d 1112 (10th Cir. 1974). In that case the Tenth Circuit considered Utah's informal policy of funding under the Medicaid program only "therapeutic" abortions which were defined by Director Rose to be those "necessary to save the life of the expectant mother or to prevent serious and permanent impairment to her physical health, and none other." 499 F.2d at 1113. Although the court invalidated the policy on constitutional grounds, the court first noted that "in [its] view there is nothing in either the *federal* or state statutes which specifically bars the policy here followed by Rose." *Id.* at 1114 (emphasis added). Thus, this court feels that the conclusion reached herein is consonant not only with Title XIX and *Beal,* but also with the available authority in this circuit. Additionally, the United States District Court for the Eastern District of Virginia has recently ruled that Virginia's Medicaid abortion funding provision, substantially similar to Utah's, is not inconsistent with Title XIX. *Doe v. Kenley,* Civil No. 78–218–A (E.D.Va., Alexandria Div., filed May 25, 1978).

Finally, as discussed earlier, the Supreme Court in *Beal* held that states have "unquestionably strong and legitimate" interests in encouraging normal childbirth, and that these interests should not be undercut in the absence of a clear and strong contrary congressional intent. 432 U.S. at 446, 97 S.Ct. 2366. It has been amply demonstrated herein that *there is no such clear and strong contrary congressional intent re-*

---

**2.** Indeed, Utah may exceed any Title XIX requirement in that Utah appears to provide funding for abortions obtained in cases of rape and incest and where the health of the fetus is endangered, depending upon the force to be given to the noncodified but express legislative policy set forth in Item 175 of House Bill 462.

*garding the funding of abortions under Title XIX.* At stake in this action is the ability of the State of Utah to further its strong interests in encouraging normal childbirth and its equally strong interest in controlling its own pursestrings. Absent in this action is a showing by plaintiff that anything in Title XIX suggests that these state interests should not be given full recognition and effect. Therefore, this case clearly is distinguishable from the many cases cited by plaintiff wherein state interests were forced to give way to federal interests in the face of clear federal statutory and regulatory language and intent at odds with those of the state. *See, e. g., King v. Smith,* 392 U.S. 309, 88 S.Ct. 2128, 20 L.Ed.2d 1118 (1968) (state modification of AFDC provision conflicted with the express and repeatedly reaffirmed federal provision). Because there is no federal provision contrary to the Utah provisions, there is no conflict between federal and state law. Under these circumstances, the court is loath to strike down the Utah statute and thereby interfere in the state's deliberate allocation of substantial public funds in this most complex and dynamic area. To do so would constitute a serious violation of the spirit of the Tenth Amendment to the Constitution. This court will not "presume that Congress intended to condition [Utah's] participation in the Medicaid program on its willingness to undercut . . . ." the state's important interests. *Beal v. Doe,* 432 U.S. 438, 446, 97 S.Ct. 2366, 2372, 53 L.Ed.2d 464 (1977).

Participation in Social Security programs such as the Medicaid program is a joint effort of the federal and state governments and is based on a "scheme of cooperative federalism." *King v. Smith,* 392 U.S. 309, 316, 88 S.Ct. 2128, 20 L.Ed.2d 1118 (1968). In these programs the states have great latitude in establishing standards for the administration of the various plans. Through normal legislative processes Utah has set the standards by which it will abide, and no federal standards conflict with those chosen by Utah. Thus, this court's position must be in harmony with that expressed by the Supreme Court in *Dandridge v. Williams,* 397 U.S. 471, 90 S.Ct. 1153, 25 L.Ed.2d 491 (1970):

> Conflicting claims of morality and intelligence are raised by opponents and proponents of almost every measure, certainly including the one before us. *But the intractable economic, social and even philosophical problems presented by public welfare assistance programs are not the business of this Court. . . . [T]he Constitution does not empower this Court to second-guess state officials charged with the difficult responsibility of allocating limited public welfare funds among the myriad of potential recipients.*

397 U.S. 471 at 487, 90 S.Ct. at 1162 (emphasis added). *See also Doe v. Wohlgemuth,* 376 F.Supp. 173, 182–86 (W.D.Pa. 1974), *aff'd in part, Beal v. Doe,* 432 U.S. 438, 97 S.Ct. 2366, 53 L.Ed.2d 464 (1977). That this court should not upset the decision of the State of Utah by an unjustifiably broad reading of the law is strengthened by the conclusion of the Supreme Court in *Maher*: "Indeed, when an issue involves policy choices as sensitive as those implicated by public funding of nontherapeutic abortions, the appropriate forum for their resolution in a democracy is the legislature." 432 U.S. at 479, 97 S.Ct. at 2385.

All that remains for this court's decision are two procedural matters. First, inasmuch as plaintiff instituted this action as a class action and defendants have not resisted the maintenance of the action as such, the action will be considered as a class action. The court finds that the prerequisites of Rule 23(a), *Federal Rules of Civil Procedure,* have been met and that defendants have acted or refused to act on grounds generally applicable to the class, thereby making injunctive and declaratory relief appropriate. Rule 23(b)(2), *Federal Rules of Civil Procedure.* Second, since matters outside the pleadings have been presented to and not excluded by the court, defendants' motion to dismiss will be treated as one for summary judgment. Rule 12(b), *Federal Rules of Civil Procedure.*

Accordingly,

IT IS HEREBY ORDERED that plaintiff's action shall be maintained as a class

action under Rule 23(a) and Rule 23(b)(2), *Federal Rules of Civil Procedure.*

IT IS FURTHER ORDERED that plaintiff's request of this court to enter "a final Judgment pursuant to Sections 2201 and 2202 of Title 28, United States Code, and Rules 54, 57, 58 and 65 of the Federal Rules of Civil Procedure, declaring that insofar as House Bill 447 and the challenged language of Item 175 of House Bill 462 enact restrictions on the right to secure an abortion, the same are in violation of the laws and Constitution of the United States of America, and to permanently enjoin the defendants, their agents and employees, their successors in office and all other persons acting in active concert and participation with said defendants from enforcement of said statutes" is denied.

IT IS FURTHER ORDERED that plaintiff's motion to modify the prior order of this court of October 14, 1977, is denied.

IT IS FURTHER ORDERED that plaintiff's request for an award of her costs and attorney's fees is denied.

IT IS FURTHER ORDERED that defendants' motion to dismiss shall be treated as a motion for summary judgment and the same is granted.